T.C. Memo. 2010-185

UNITED STATES TAX COURT

ESTATE OF ROGER E. STANGELAND, DECEASED, LILAH M. STANGELAND,
EXECUTOR AND LILAH M. STANGELAND, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14402-08.              Filed August 16, 2010.

Edward M. Robbins, Jr., and Cory Stigile, for petitioners.

Kris H. An and Nathan C. Johnston, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes and penalties as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 2002 | $369,406 | $73,881 |
| 2003 | 542,776 | 108,555 |
| 2004 | 440,850 | 88,170 |

The issues for decision are whether petitioners may deduct on Schedule C, Profit or Loss From Business, losses incurred by Roger Stangeland in the course of his consulting activities, whether losses attributable to a partnership owning and operating airplanes are losses from a passive activity, and whether petitioners are liable for accuracy-related penalties under section 6662(a).

The parties also dispute Roger Stangeland's basis in R & L Air, which is relevant because Roger Stangeland died in 2004 and petitioners can deduct from their nonpassive income in 2004 an amount of R & L Air's loss from a passive activity that depends on Roger Stangeland's basis. See sec. 469(g). This issue has been postponed for further proceedings.

All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Lilah Stangeland resided in California at the time the petition was filed. Roger Stangeland (decedent) died on February 27, 2004.

Petitioners owned numerous companies. Between 2002 and 2004, petitioners had ownership interests in: (1) Casa Encantada, a hotel/motel in Acapulco, Mexico; (2) Wauconda

Associates, an entity formed to own and operate the Liberty Square Shopping Center in Wauconda, Illinois; (3) Lido Partners, an entity formed to own and operate the Via Lido Shopping Center in Newport Beach, California; (4) Warehouse Investment Partners, an entity formed to own and operate a warehouse in La Mirada, California; (5) Rancho Encantado, Inc., an S corporation that owns and operates a residential rental property and walnut grove near Santa Barbara, California; (6) Lido Diner, L.L.C., an entity formed to own and operate Lido Diner, a restaurant in Newport Beach, California; (7) New Twist, L.L.C., an entity formed to own and manage two retail stores in Eugene, Oregon; (8) Hawaiian Fruit Specialties, L.L.C., an entity formed to market fruit jam products; and (9) R & L Air, L.L.C., an entity formed to own and lease out two airplanes.

In addition, between 2002 and 2004, petitioners were the sole shareholders of Encantado Enterprises, Inc., an S corporation that held a 99-percent limited partnership interest in the Stangeland Family Limited Partnership. Petitioners held directly a 1-percent general partnership interest in the Stangeland Family Limited Partnership. The Stangeland Family Limited Partnership had ownership interests in the following entities: (1) Indianhead Mountain Enterprises, L.L.C., an entity formed to own and operate the Indianhead Mountain Resort in Michigan; (2) Indianhead Mountain, L.L.C., an entity formed to

hold title to the liquor license for the Indianhead Mountain Resort; and (3) Quality Drug Corp., an entity formed to own and operate drug stores in Newport Beach and Laguna Beach, California. In 2003, Quality Drug Holdings Corp. was formed and became the owner of Quality Drug Corp. Petitioners received an ownership interest in Quality Drug Holdings Corp.

We refer collectively to all of the above businesses as the businesses or petitioners' businesses. Except for Casa Encantada, Rancho Encantado, Encantado Enterprises, and R & L Air, petitioners share ownership of the businesses with third parties or their children. Mrs. Stangeland kept track of the books, records, and miscellaneous expenses and wrote the checks for Rancho Encantado.

The businesses each had separate management groups. The pharmacies owned by Quality Drug Corp. sold jams produced by Hawaiian Fruit Specialties, but other than that, there were no products produced by one of petitioners' businesses and used by another.

Aside from his business interests, decedent served on the boards of the Boy Scouts of America, the Los Angeles Chamber of Commerce, the Pasadena Playhouse, the Board of Fellows of Claremont Graduate School, and St. John's Northwestern Military Academy. Decedent was the president of petitioners' private charity, the Roger and Lilah Stangeland Foundation, and

petitioners were also active in fundraising for Methodist Hospital, the Pasadena Playhouse, and St. John's Northwestern Military Academy.

Decedent owned and operated a consulting services business called ResEnt as a sole proprietorship to help him manage petitioners' businesses. Decedent worked approximately 50 hours a week for ResEnt. Petitioners' 2002, 2003, and 2004 Forms 1040, U.S. Individual Income Tax Return, included Schedules C for ResEnt. Petitioners recognized no income from decedent's consulting services, although decedent did report some income on his Schedules C from subletting part of ResEnt's office space. Decedent incurred expenses that were reported on his ResEnt Schedules C and include office rent, supplies, travel, accounting, and legal fees. Decedent also hired Joanne Caccamo as his executive assistant and reported her salary as an expense on the ResEnt Schedules C under "Wages".

In 2003, decedent hired Roger Henn to help find ways to operate petitioners' businesses more profitably and efficiently, and to help decedent identify new business ventures. Henn helped decedent find and acquire businesses in situations where decedent thought he had a particular skill or insight that could help those businesses grow and either make them profitable in the long run or put them in a position where they could be sold for a profit. Henn was compensated by ResEnt in 2003 and 2004, and

decedent reported Henn's compensation as an expense on the ResEnt 2003 and 2004 Schedules C under "Legal and professional services".

Decedent and Henn provided a number of services to petitioners' businesses to sustain or enhance their profitability. For example, decedent oversaw the construction of the Lido Diner and designed the menu. Decedent and Henn also designed the store layout for the second of Quality Drug Corp.'s pharmacies. Henn helped create Quality Drug Corp.'s infrastructure and conducted negotiations to acquire the location for a third store. Henn was also involved in the day-to-day management of Indianhead Mountain. In no case was either decedent or Henn reimbursed for his services by the business he was advising.

When either decedent or Henn traveled to advise the management of petitioners' businesses, he often used R & L Air's airplanes. In 2002, R & L Air owned two airplanes--a King Air and a Canadair Challenger. In December 2002, R & L Air conducted a like-kind exchange, trading the Challenger for a Gulfstream G-III. On its 2002 Form 8824, Like-Kind Exchanges, R & L Air reported that it transferred the Challenger, with a fair market value of $4.5 million, on December 30, 2002, and received the Gulfstream, with a fair market value of $5,808,236. R & L Air completely refurbished the Gulfstream in 2003, replacing the

interior and painting the exterior.  R & L Air included two entries to its 2003 depreciation schedule:  "GS3-1031 NEW", with an unadjusted cost or basis of $1,508,236, and "GS3-REFURBISH", with an unadjusted cost or basis of $1,865,200.  R & L Air continued to operate the King Air and Gulfstream in 2004.

To help manage the airplanes, R & L Air hired Pinnacle Air Group, Inc.  In the Aircraft Management Agreement, signed by the parties in September 2000 and again in October 2003, Pinnacle Air Group agreed that

> 1.2  Manager [Pinnacle Air Group] shall supply to owner [R & L Air] all services and functions customarily provided pursuant to management agreements including, but not limited to:
>
> a.   Employment and/or supervision of flight and maintenance personnel assigned to Owner's Aircraft;
>
> b.   Maintenance management at contract facilities, and related maintenance support functions;
>
> c.   Aircraft insurance through Manager fleet policy,
> * * *
>
> d.   Liaison with aviation regulatory agencies including the FAA on Owner's behalf and compliance with all statutes, ordinances, rules and regulations enforced by such agencies;
>
> e.   Flight and maintenance scheduling, planning, and communications;
>
> f.   Record keeping, reporting, budgeting, and other administrative systems;
>
> g.   Travel support services for Owner's passengers, as required;

> h. Miscellaneous support services associated with the daily operation, maintenance, scheduling, and administration of the Aircraft;
>
> i. Management supervision of the operation and maintenance of the Aircraft; and,
>
> j. Provide the necessary FAR Part 91 Aircraft Lease Agreements to Owner and Lessee should such arrangements be required.  In addition, Manager will provide Owner with necessary flight time information for Lessee invoicing purposes. Manager will be responsible for invoicing each respective Lessee for Pilot Services and associated expenses.  Pilot Service revenue collected from Lessee will be credited to Owners [sic] account accordingly.

When one of the R & L Air airplanes needed maintenance, Curt Pavlicek, the owner of Pinnacle Air Group, would call decedent with bids from various maintenance facilities and would review each item of maintenance with him.  Pinnacle Air Group charged R & L Air a monthly management fee for the services listed in the aircraft management agreement.

Both decedent and Pavlicek were involved in the negotiations for the sale of the Challenger and the purchase and refurbishment of the Gulfstream.  At times during the sale, purchase, and refurbishment, Pavlicek would speak with decedent three or four times a week.  During the refurbishment of the Gulfstream, decedent and Pavlicek met in Appleton, Wisconsin, for a couple of days to decide what features to install in the Gulfstream.  In return for Pinnacle Air Group's help in arranging the transaction, R & L Air paid Pinnacle Air Group a commission.

When ResEnt used one of R & L Air's airplanes, Caccamo was responsible for keeping track of the expenses. Caccamo would receive the flight logs from the pilots of the planes and would document, among other things, the flight number, the mileage, and the flight's business purpose.

In addition to flying for business, decedent also used R & L Air for flights related to his charitable activities. Some of those flights were billed to, and paid for by, ResEnt, even though they were unrelated to petitioners' businesses. Some flights paid for by ResEnt were for petitioners' pursuits of private investment opportunities not directly related to petitioners' other businesses. For example, on several occasions in 2002, Caccamo's log listed petitioners' flights to San Jose for meetings with a silk flower/floral manufacturing and design company decedent was considering acquiring. On November 25, 2002, petitioners flew to Minneapolis for meetings with Quality Drug Corp. partners to discuss, among other things, the silk flower manufacturing company, and for Thanksgiving. On June 27, 2003, Henn flew to Oakland to meet with the silk flower manufacturing company.

Petitioners' 2002-2004 Federal income tax returns were prepared under the direction of George McCrimlisk, an accountant with over 20 years of experience. On November 7, 2003, an opinion letter directed to decedent by Min Yoo from the

accounting firm KPMG (the KPMG letter) addressed the question of whether R & L Air should be classified as a passive activity. The letter first concluded that R & L Air is not engaged in rental activity because the average period of customer use of the planes is less than 7 days. The letter then addressed whether decedent materially participated in R & L Air. It concluded that he did, because

> As Mr. Stangeland has the sole responsibility for running the daily business and seeing to all the details, he has regular, continuous and substantial involvement. He alone ensures that his vision and direction for the business are being appropriately executed. It is our understanding that Mr. Stangeland spends greater than 500 hours per year on the airplane business.

The letter also noted that "Mr. Stangeland is the only other individual performing services besides the pilot who works for the leasing company. As such, he is the one who shoulders all the managerial responsibilities of running the business."

Petitioners created a living trust (the trust) on December 23, 1988, for which petitioners were the grantors and co-trustees. The trust document states:

> 9.1 <u>Succession of Co-Trustee</u>. If either individual Trustee named in this Trust Agreement shall cease to act as Co-Trustee hereunder, then the other individual Co-Trustee shall act as sole Trustee under this Trust Agreement.
>
> 9.2 <u>Designated Successor Trustee</u>. If both individual Co-Trustees named in this Trust Agreement shall cease to act as Trustee hereunder, then GREGORY P. STONE shall act as successor Trustee hereunder. If he shall fail to qualify or cease to act as Trustee

> hereunder, then the following named alternative
> successor Trustees shall serve in the order listed:
> > FIRST:  MICHAEL F. HENN
> > SECOND: SECURITY PACIFIC NATIONAL BANK

On February 26, 2004, petitioners transferred assets into the trust, including their interests in R & L Air.  After decedent's death, Mrs. Stangeland signed the checks for ResEnt.  Mrs. Stangeland became the final authority with regard to petitioners' businesses.

## OPINION

Respondent determined that petitioners could not deduct expenses for ResEnt consulting activities on decedent's Schedules C because ResEnt is not a trade or business.  Respondent also argues that petitioners' losses from R & L Air are passive activity losses and should be suspended under section 469.

A. Burden of Proof

Section 7491(a)(1) provides that

> If, in any court proceeding, a taxpayer introduces
> credible evidence with respect to any factual issue
> relevant to ascertaining the liability of the taxpayer
> for any tax imposed by subtitle A or B, the Secretary
> shall have the burden of proof with respect to such
> issue.

Petitioners argue that they have satisfied the requirements of section 7491(a)(1) and (2) to shift the burden of proof "for each of the issues before the court other than the passive activity loss hours issue".  Most of the issues in this case are decided on the preponderance of the evidence, so the burden of proof is

not relevant.  See Estate of Black v. Commissioner, 133 T.C. __,
__ (2009) (slip op. at 30); Knudsen v. Commissioner, 131 T.C.
185, 189 (2008).  When we make assumptions which support
respondent's determination, it is because petitioners have failed
to introduce credible evidence to the contrary, so the burden of
proof does not shift.  See sec. 7491(a)(1).

B. Schedule C Expenses

Section 162(a) provides that "There shall be allowed as a
deduction all the ordinary and necessary expenses paid or
incurred during the taxable year in carrying on any trade or
business".  "[T]o be engaged in a trade or business, the taxpayer
must be involved in the activity with continuity and regularity
and * * * the taxpayer's primary purpose for engaging in the
activity must be for income or profit." Commissioner v.
Groetzinger, 480 U.S. 23, 35 (1987).

Respondent argues that ResEnt is not a trade or business
because decedent did not engage in consulting services for income
or profit.  Petitioners' response is two pronged.  First,
petitioners argue that decedent engaged in ResEnt for income or
profit because ResEnt's consulting increased the profitability of
petitioners' other businesses.  Alternatively, petitioners argue
that under section 183 the ResEnt undertaking is part of an
activity that encompasses all of petitioners' other undertakings

(petitioners' businesses), and decedent's profit motive in the ResEnt undertaking must be viewed from this perspective.

1. Whether ResEnt Was Conducted for Profit

ResEnt received no compensation for its consulting services. Petitioners argue that ResEnt was conducted for profit, namely the increased value of petitioners' businesses.  Petitioners have persuasively argued that decedent's ResEnt activities added value to petitioners' various businesses.

However, the Supreme Court has long held that activity geared towards increasing the value of investments is not a trade or business.  In Whipple v. Commissioner, 373 U.S. 193, 202-203 (1963), the Supreme Court stated:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged.  Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.  When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. * * *
>
> If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice.  To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a

regular course of promoting corporations for a fee or
commission, * * * or for a profit on their sale, see
Giblin v. Commissioner, 227 F.2d 692 * * * [(5th Cir.
1955)], but in such cases there is compensation other
than the normal investor's return, income received
directly for his own services rather than indirectly
through the corporate enterprise * * *.  On the other
hand, since the Tax Court found, and the petitioner
does not dispute, that there was no intention here of
developing the corporations as going businesses for
sale to customers in the ordinary course, the case
before us inexorably rests upon the claim that one who
actively engages in serving his own corporations for
the purpose of creating future income through those
enterprises is in a trade or business.  That argument
is untenable * * *

This Court elaborated:

    To fall within the rule established in Giblin
[holding that a certain type of consulting is a trade
or business], petitioner must show that the entities
were organized with a view to a quick and profitable
sale after each business had become established, rather
than with a view to long-range investment gains.  * * *

    It is the early resale which makes the profits
income received directly for services, for the longer
an interest is held, the more profit becomes
attributable to the successful operation of the
corporate business. * * *

Deely v. Commissioner, 73 T.C. 1081, 1093-1094 (1980); see

Ackerman v. Commissioner, T.C. Memo. 2009-80; Farrar v.

Commissioner, T.C. Memo. 1988-385; see also Bell v. Commissioner,

200 F.3d 545, 548 n.2 (8th Cir. 2000), affg. T.C. Memo. 1998-136.

In Deely, the taxpayers sought to deduct the full amount of a

loan made to companies they owned as a bad business debt.  Deely

v. Commissioner, supra at 1082.  We found that the taxpayers did

not organize entities with the intent for quick resale, but held

on to profitable investments.  Id. at 1094-1096.  We therefore concluded that the taxpayers acted as investors and that their activities were investing activities and not a trade or business. Id. at 1096.

In Ackerman v. Commissioner, supra, we considered the taxpayer's contention that the advisory services he provided to companies he owned were a trade or business.  We stated that for the taxpayer to prevail, he must show that his advisory services were provided with the purpose of selling his interest in the relevant companies at a profit in the ordinary course of his alleged business.  Id.

ResEnt's consulting activities were geared towards increasing the investment value of petitioners' businesses, and ResEnt was therefore not a trade or business.  ResEnt did not provide a particular service to petitioners' businesses.  Henn testified that he was hired by ResEnt for

> At the outset principally two purposes.  One was
> to help Roger [decedent] find ways to operate the
> businesses that he owned better; that is, more
> profitably, more efficiently and ultimately to produce
> a higher level of profit, and secondly to help him
> identify new business ventures that he could own and
> operate again for the purpose of producing a profitable
> business.

ResEnt provided consulting for the general purpose of increasing the value of petitioners' other businesses.  Decedent was not conducting a trade or business; he was monitoring his investments.  The second purpose for which Henn was hired, to

find new investments, further enforces our conclusion that ResEnt was involved in investing activities, not a trade or business. Petitioners' suggestion that the potential investment in the silk flower manufacturing company would have been an enhancement of petitioners' existing businesses rather than a new acquisition is unconvincing and contrary to Henn's testimony, in which he referred to "new business ventures".

Petitioners have not shown that decedent's consulting services were provided with the purpose of selling petitioners' interest in the businesses in a quick and profitable sale, rather than with a view to long-term investment gains. Although the record does not establish when petitioners acquired all of their businesses, apparently they did not sell any businesses during the 3 years under consideration. Further, many of the businesses involved joint ventures, making them more difficult to sell. The services decedent provided were geared towards enhancing a business's long-term profitability. This case is unlike Lundgren v. Commissioner, 376 F.2d 623, 627-628 (9th Cir. 1967) (holding that the taxpayer was involved in a trade or business when the return sought was shown to be different from that flowing to an investor), revg. T.C. Memo. 1965-314, a case relied on by petitioners. We conclude that decedent was not in the business of providing consulting services to companies he owned so he could profit from their quick resale in the ordinary course of

his business.  We therefore hold that ResEnt is not a trade or business but is rather a vehicle for enhancing the value and profitability of petitioners' investments.

Petitioners argue that this case is similar to Campbell v. Commissioner, 868 F.2d 833 (6th Cir. 1989), affg. in part and revg. in part T.C. Memo. 1986-569, where the court considered whether a taxpayer could deduct losses from a partnership formed to lease an airplane to a corporation controlled by the taxpayer and the other partners.  In Campbell the court found that a profit motive could exist for an activity that derived its income from a related corporation.  See De Mendoza v. Commissioner, T.C. Memo. 1994-314.  Campbell is distinguishable on numerous grounds.  First, the partners and the shareholders of the two entities in Campbell were substantially the same.  In this case, the owner of ResEnt, decedent, is not substantially the same as the owners of the businesses, which, depending on the particular business, consisted of petitioners and petitioners' children or third parties.  Second, in Campbell the purpose of the partnership was to lease an airplane to a particular corporation; the two entities were closely related.  In this case, petitioners viewed ResEnt as an independent activity, attributing all consulting activity to ResEnt regardless of the entity benefited by the activity and using ResEnt as a vehicle for deducting expenses unrelated to consulting.  Third, our decision that ResEnt is not

a trade or business turns on our finding that ResEnt was a vehicle primarily for the enhancement of petitioners' investments. In contrast to the partnership in Campbell, which provided airplane leasing, ResEnt did not provide a particular service to petitioners' businesses but tried to increase their profitability in general. The type of services ResEnt provided further supports our conclusion that it operated to enhance petitioners' investments and was not a trade or business under section 162.

Petitioners argue in the alternative that if ResEnt expenses are not deductible, they should be viewed as capital contributions that increase petitioners' bases in the businesses. Petitioners' bases in all their businesses except R & L Air are not relevant to deciding their tax deficiencies or penalties for the years at issue. To the extent decedent's basis in R & L Air is relevant to deciding petitioners' deficiencies or penalties, petitioners have failed to present reliable evidence of the value of ResEnt's consulting services or the proper allocation of ResEnt expenses to R & L Air. See Rule 142(a).

Petitioners have not argued that ResEnt's expenses are miscellaneous itemized deductions, deductible on Schedule A, Itemized Deductions, because they are expenses for production of income. See secs. 63(a), (d), 67(a) and (b), 212. The amount deductible under section 212 is limited to the amount exceeding 2

percent of the taxpayer's adjusted gross income. Secs. 63(a), (d), 67(a) and (b), 162(a). Furthermore, the total amount of itemized deductions on Schedule A may be reduced if the taxpayer's adjusted gross income exceeds an applicable amount. Sec. 68(a) and (b). We assume that petitioners did not argue that ResEnt's expenses are itemized deductions because the characterization would be of limited use given the restrictions. Because petitioners do not argue that issue, we do not address it.

    2. <u>Whether ResEnt and Petitioners' Other Businesses Are One Activity Under Section 183</u>

Petitioners argue in the alternative that to determine whether ResEnt is operated for profit, we should view it as merged with petitioners' other businesses. Section 1.183-1(d)(1), Income Tax Regs., provides the standard for determining whether two or more undertakings may be consolidated into one activity for this purpose:

> [W]here the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several

>     undertakings either as a single activity or as separate
>     activities. * * *

In addition to the factors in the regulation, we have also considered: (a) Whether the undertakings are conducted at the same place; (b) whether the undertakings were part of the taxpayer's efforts to find new sources of revenue from existing assets or relationships; (c) whether the undertakings were formed as separate activities; (d) whether one undertaking benefited from the other; (e) whether the taxpayer used one undertaking to advertise the other; (f) the degree to which the undertakings shared management; (g) the degree to which one caretaker oversaw the assets of both undertakings; (h) whether the taxpayer used the same accountant for the undertakings; and (i) the degree to which the undertakings shared books and records. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); see also Topping v. Commissioner, T.C. Memo. 2007-92; Mitchell v. Commissioner, T.C. Memo. 2006-145. Petitioners propose that under these standards ResEnt and their businesses should be viewed as one activity. Whether we view all the businesses and ResEnt as one activity or we view each business and the ResEnt consulting activity associated with that business as one activity, petitioners' argument fails.

Petitioners' businesses cannot be viewed as one activity under section 183. Other than decedent, who was involved in all of petitioners' businesses, the businesses had different

management structures.  While some businesses may have complemented one another--for example, Hawaiian Fruit Specialties' jam was sold in Quality Drug Corp.'s stores and Lido Partners shared partners with Lido Diner and Quality Drug Holdings Corp.--the businesses as a whole were separately functioning entities, neither dependent on nor providing benefits to one another.  Petitioners argue that the businesses all drew on decedent's knowledge of retail sales, but the businesses fail almost all the additional factors:  The businesses were not conducted in the same place; they were formed and treated by petitioners as separate entities; except Hawaiian Fruit Specialties, the businesses did not benefit from each other; they shared only very limited management; and they kept separate books and records.

Petitioners also cannot aggregate each business with the ResEnt consulting activity associated with that business. Decedent conceived of and structured ResEnt as separate from petitioners' businesses, with separate offices and separate employees.  Decedent conducted his advising through ResEnt, regardless of the businesses he was advising.  Decedent also used ResEnt as a vehicle for deducting the cost of trips that were not deductible as a trade or business expense, such as trips to St. John's Northwestern Military Academy for board meetings. Decedent's nonconsulting activities belie petitioners' arguments

that under section 1.183-1(d), Income Tax Regs., ResEnt and petitioners' businesses are economically intertwined and should be joined to form one activity.

The additional factors, on balance, favor respondent. ResEnt and the businesses had separate offices, so the first factor favors respondent. The businesses were not created to create a new revenue source from a particular asset, so the second factor favors respondent. The businesses were formed as separate entities, so the third factor favors respondent. ResEnt did provide benefits to the businesses, so the fourth factor favors petitioners. ResEnt did not function to advertise or promote the businesses, so the fifth factor is neutral. Decedent played a role in managing the companies and was also involved in ResEnt, but there is no evidence of other management overlap between ResEnt and the businesses, so the sixth factor favors respondent. Decedent oversaw both ResEnt and the businesses, so the seventh factor favors petitioners. ResEnt had its own bookkeeper, who kept separate books for ResEnt, so the eighth and ninth factors favor respondent.

Given that decedent was free to choose the structure of ResEnt, we view with suspicion petitioners' current attempt to convince us that the separate structures of ResEnt and the businesses should be disregarded. See Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580 (1977); Yamamoto v.

Commissioner, 73 T.C. 946, 954-955 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982). ResEnt's structure and books reflect that decedent used ResEnt as a catchall to expense his investment and charitable activities on Schedules C, not as a vehicle to enhance a particular business. Petitioners may arrange their affairs to make a profit in a particular corporation, see Campbell v. Commissioner, 868 F.2d at 836, but they may not create structures with separate offices, separate management, separate owners, separate books, and separate undertakings and then later claim that the structures they created are really one activity under section 183. We conclude that ResEnt and the businesses are separate activities under section 183, and we will not look at the profit of the businesses in assessing whether ResEnt was operated for profit.

In sum, we conclude that ResEnt was not a trade or business and petitioners were not entitled to deduct ResEnt's expenses on Schedule C.

C. R & L Air's Losses

Respondent argues that R & L Air's losses are passive activity losses and should be suspended under section 469. Section 469(a)(1) and (d) suspends the deductibility of losses from certain passive activities to the extent the losses exceed the aggregate income those activities generate. Generally, a passive activity is a trade or business in which the taxpayer

does not materially participate. Sec. 469(c)(1). Material participation is defined generally as regular, continuous, and substantial involvement in the business operations. Sec. 469(h)(1).

A taxpayer can establish material participation by satisfying any one of the seven tests provided in the regulations. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988); see Akers v. Commissioner, T.C. Memo. 2010-85. Petitioners direct our attention to four of those tests.

The first test is whether an individual participates in the activity for over 500 hours during the year. Sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra. The second test is the significant participation activity test. Under that test, (1) the activity must be a significant participation activity for the taxable year, and (2) the individual's aggregate participation in all significant participation activities during the year must exceed 500 hours. Sec. 1.469-5T(a)(4), Temporary Income Tax Regs., supra. An activity is a significant participation activity only if (1) the activity is a trade or business, (2) the individual participates in the activity for more than 100 hours during the year, and (3) the individual cannot establish material participation under any of the other material participation tests in the regulations. Sec.

1.469-5T(c), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). The third test is whether, based on all of the facts and circumstances, the individual participates in the activity on a regular, continuous basis. Sec. 1.469-5T(a)(7), Temporary Income Tax Regs., supra. However, under this test, an individual's services performed in the management of an activity are not taken into account, unless no person other than the individual who performs services in connection with the management of the activity receives compensation in consideration for such services and no person performs services in connection with the management of the activity that exceed the amount of services performed by the individual. Sec. 1.469-5T(b)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). The fourth test is whether an individual materially participated in the activity for 5 of the past 10 years under a different test in the regulations. Sec. 1.469-5T(a)(5), Temporary Income Tax Regs., supra.

Under all these tests, participation in an activity is defined to exclude work done by an individual in the individual's capacity as an investor in the activity unless the individual is directly involved in the day-to-day management or operations of the activity. Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). Work done by an individual in the individual's capacity as an investor in the

activity includes studying and reviewing financial statements or reports on operations of the activity, preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use, and monitoring the finances or operations of the activity in a nonmanagerial capacity. Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra. Any participation by an individual's spouse is treated as participation by the individual. Sec. 1.469-5T(f)(3), Temporary Income Tax Regs., supra. We therefore treat petitioners as one unit for the purposes of determining their participation in an activity.

Petitioners do not argue, nor would the record support a finding, that they participated in R & L Air for over 500 hours in any of the tax years in issue. However, decedent did work over 500 hours in 2002 and 2003 on ResEnt. Petitioners argue that for the purposes of the passive activity test, we should view R & L Air and ResEnt as one activity under section 1.469-4, Income Tax Regs.

Section 1.469-4(c), Income Tax Regs., provides that multiple trade or business activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for the purposes of section 469. A trade or business activity is defined as an activity (other than activities that are irrelevant here) that involves the conduct of

a trade or business under section 162, is conducted in anticipation of the commencement of a trade or business, or involves research or experimental expenditures that are deductible under section 174 or would be deductible if the individual adopted the method described in section 174(a). Sec. 1.469-4(b)(1), Income Tax Regs.

To aggregate R & L Air and ResEnt, petitioners must show that both R & L Air and ResEnt are trade or business activities as defined in the regulations. Petitioners do not argue that ResEnt was conducted in anticipation of the commencement of a trade or business. Nor can we, on this record, determine what such a trade or business would be. Petitioners also do not argue that ResEnt involves research or experimental expenditures that are deductible under section 174. Nor can we, on this record, determine what such research expenditures would be. We are left, then, with the question of whether ResEnt is an activity that involves the conduct of a trade or business under section 162, an issue we addressed earlier. We decided that ResEnt did not involve the conduct of a trade or business under section 162. We therefore conclude that ResEnt is not a trade or business activity under section 1.469-4(b)(1), Income Tax Regs., and that ResEnt cannot be aggregated with R & L Air under section 1.469-4(c), Income Tax Regs., to help petitioners meet the 500

hour threshold under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra.

Petitioners argue in the alternative that R & L Air satisfies the significant participation activity test under section 1.469-5T(a)(4), Temporary Income Tax Regs., supra, because both R & L Air and ResEnt are significant participation activities and petitioners participated in both activities for more than 100 hours each and more than 500 hours combined. See sec. 1.469-5T(c)(2), Temporary Income Tax Regs., supra.

An activity is a significant participation activity of an individual if and only if (1) the activity is a trade or business activity under section 1.469-1T(e)(2), Temporary Income Tax Regs., 57 Fed. Reg. 20753 (May 15, 1992), in which the individual significantly participates, and (2) the activity would be an activity in which the individual does not materially participate if material participation were determined without regard to the significant participation activity test. Sec. 1.469-5T(c)(1), Temporary Income Tax Regs., supra. The first prong, the trade or business activity test, is the same as under section 1.469-4(b)(1), Income Tax Regs. See sec. 1.469-1T(e)(2), Temporary Income Tax Regs., supra (reference to section 1.469-1(e)(2), Income Tax Regs. (reference to section 1.469-4(b)(1), Income Tax Regs.)). To satisfy the second prong, the individual (1) must have less than 500 hours of participation, as

participation in excess of 500 hours would satisfy the test at section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, and (2) must not be the individual with the most hours of participation in the activity, as a person with the most hours of participation in the activity, if in excess of 100 hours, satisfies the test at section 1.469-5T(a)(3), Temporary Income Tax Regs., supra. See Scheiner v. Commissioner, T.C. Memo. 1996-554.

ResEnt is not a significant participation activity. We have already decided that ResEnt is not a trade or business activity under section 1.469-4(b)(1), Income Tax Regs. Furthermore, even if we assumed ResEnt is a trade or business activity, it would fail the second prong of the test because decedent participated in ResEnt for over 500 hours and therefore materially participated in ResEnt under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra.

Although ResEnt is not a significant participation activity, petitioners' businesses may be. Respondent does not contest that petitioners' other businesses are trades or businesses under section 162. Petitioners did not participate in the businesses for over 500 hours; and since each of the businesses had full-time employees, petitioners did not have the most participation in the businesses. Thus, the final step in our analysis is to determine whether petitioners' participation in any of the

businesses exceeds 100 hours, and whether petitioners' participation in all significant participation activities exceeds 500 hours, for each year in issue. Sec. 1.469-5T(a)(4), Temporary Income Tax Regs., supra.

The regulations provide that participation in an activity may be established by any reasonable means. While contemporaneous records are not required, reasonable means may include appointment books, calendars, or narrative summaries. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. The regulations do not allow a postevent "ballpark guesstimate", and we are not bound to accept the unverified, undocumented testimony of taxpayers. See Shaw v. Commissioner, T.C. Memo. 2002-35; Scheiner v. Commissioner, supra.

To prove the businesses for which, and the number of hours that, decedent worked in 2002, 2003, and 2004, petitioners provide both testimony and documentary evidence. The testimony consists of Caccamo's recollections for 2002, 2003, and 2004, Henn's recollections for 2003 and 2004, and Pavlicek's recollections regarding R & L Air. The documentary evidence includes decedent's calendar and flight logs that indicate the purposes of decedent's travel. Independently, each form of evidence is insufficient for us to make a determination regarding the number of hours decedent worked. The testimony, because it relates to such a long stretch of time many years ago and because

it was given by witnesses who did not personally observe all of the hours they claimed decedent worked, is unreliable.  The documentary evidence is insufficient because neither the calendar nor the flight logs specify the number of hours decedent worked. They tend to corroborate the testimony of the witnesses because they show decedent's involvement with the businesses, but alone they do not permit us to determine the number of hours decedent actually worked.  Furthermore, some of the flight logs indicate flights taken for nonbusiness purposes, and some indicate flights taken for multiple purposes, some of which were nonbusiness. Thus, where there is testimony that establishes the amount of time decedent worked and the documentary evidence corroborates the witness's estimations, we accept those estimations as true; otherwise, we do not.  See Shaw v. Commissioner, supra; Scheiner v. Commissioner, supra

Decedent was alive for all of 2002 and 2003.  Pavlicek and Henn testified regarding decedent's participation in R & L Air during those years, and Caccamo and Henn testified regarding decedent's participation in petitioners' other businesses. Pavlicek testified that he worked closely with decedent, and that "he pretty much was hands-on to make sure that the aircraft was doing what he wanted to do."  For example, although Pavlicek was responsible for ensuring that the airplanes were properly maintained, before performing the maintenance Pavlicek would

review each procedure with decedent and would get decedent's approval for everything.  Pavlicek testified that decedent spent around 200 hours on maintenance issues.  Decedent sold R & L Air's Challenger airplane in December 2002 and purchased a Gulfstream airplane in May 2003.  Decedent was very involved in the transaction.  Pavlicek testified that between 2002 and 2003, decedent spent approximately 500 hours on the negotiations involved in selling the Challenger and buying and renovating the Gulfstream.  But Pavlicek also admitted that he did not personally spend all of the estimated hours with decedent, and that part of the figure relied on guesswork.  Nonetheless, Pavlicek's testimony regarding the time he spent with decedent, either personally or on the telephone, is sufficient to support our conclusion that petitioners spent over 100 hours participating in R & L Air during 2002 and 2003.  Decedent's participation was not simply that of an investor because decedent participated in the sale of the Challenger airplane and the purchase of the Gulfstream, the renovation of the Gulfstream, and the maintenance of the airplanes.

The record does not permit us to determine the number of hours decedent participated in petitioners' other businesses during 2002.  Henn, who worked closely with decedent in 2003, had not yet joined ResEnt, and Caccamo only testified regarding decedent's participation in ResEnt.  The calendars introduced by

petitioners are also of no help, because they do not specify the amount of time decedent spent on each meeting. We therefore conclude that for 2002, decedent did not reach the 500 hour threshold under section 1.469-5T(a)(4), Temporary Income Tax Regs., supra.

Henn joined ResEnt in 2003, and worked with decedent on advising a number of petitioners' businesses. He was therefore able to testify with specificity about decedent's participation in those businesses. Henn testified that in 2003 decedent was primarily occupied with Quality Drug Corp., Rancho Encantado, and R & L Air. For Quality Drug Corp., Henn testified that decedent designed the Laguna Beach store, supervised its construction, and hired its store manager. He estimated that decedent spent around 150 hours working for Quality Drug Corp. in 2003. Henn also testified that decedent spent 200 hours working at Rancho Encantado, supervising harvest operations and otherwise managing the property. Although we are skeptical regarding the accuracy of these estimates, Henn's testimony regarding the types of activities that decedent engaged in is credible, and combined with decedent's activities for R & L Air, we are convinced that decedent has met the 500-hour threshold under section 1.469-5T(a)(4), Temporary Income Tax Regs., supra, for 2003. The activities above are not activities performed in decedent's capacity as an investor under section 1.469-5T(f)(2)(ii),

Temporary Income Tax Regs., supra. We therefore conclude that petitioners' losses from R & L Air in 2003 are not losses from a passive activity under section 469.

Decedent died in February 2004, and petitioners concede that decedent did not participate in R & L Air for over 100 hours in 2004. Petitioners argue that the trust participated in R & L Air in 2004 by virtue of Henn's participation. However, Henn's role in the trust is unclear. Although Henn is designated a successor trustee of the trust, the trust document states that the successor trustee may not act as such unless both original trustees cease to act as trustees. Petitioners have presented no evidence that Mrs. Stangeland refused to act as trustee. In fact, the record indicates that Mrs. Stangeland assumed some of decedent's responsibilities, and signed the checks for ResEnt. Henn testified that "after Roger passed Lilah assumed the role of final decisionmaker". This testimony leads us to conclude that Mrs. Stangeland did not resign as trustee of the trust, and thus Henn was not acting as a trustee. There is no evidence, and petitioners do not argue, that Henn was employed by the trust. Henn was compensated by ResEnt in 2003 and 2004. Petitioners have failed to introduce evidence that Henn had any formal relationship to the trust, that he had any fiduciary relationship to it, or that he had any powers to bind it. This case is therefore materially distinguishable from Carter Trust ex rel.

Fortson v. United States, 256 F. Supp. 2d 536 (N.D. Tex. 2003) (holding that the material participation of a trust should be determined by reference to the persons acting on the trust's behalf). We need not address whether or how a trust may materially participate in an activity because we conclude that petitioners have failed to prove Henn's relationship with the trust. We do not consider Henn's participation in R & L Air in determining whether petitioners or the trust materially participated in R & L Air.

Petitioners have introduced no evidence of Mrs. Stangeland's participation in R & L Air. Petitioners have failed to satisfy the requirements of section 7491(a)(1) and (2) to shift the burden of proof on this issue. We therefore assume that Mrs. Stangeland did not materially participate in R & L Air. Consequently, we sustain respondent's determination that R & L Air was a passive activity in 2004.

Petitioners alternatively argue that they materially participated in R & L Air because they participated in R & L Air on a regular, continuous basis, and they fall under the catchall provision of section 1.469-5T(a)(7), Temporary Income Tax Regs., supra. Petitioners do not fall under that provision because decedent's activities, such as overseeing the sale of the Challenger and the purchase of the Gulfstream, were management activities. Pavlicek testified that decedent was "for lack of a

better word, the manager of the aircraft."  But Pinnacle Air Group, and Pinnacle Air Group's employees, were also involved in the management of R & L Air, and they received compensation in consideration for their services.  Thus, under section 1.469-5T(b)(2), Temporary Income Tax Regs., supra, decedent's management activities are not sufficient to constitute material participation under this test.

Petitioners' final argument, that they satisfied section 1.469-5T(a)(5), Temporary Income Tax Regs., supra, also fails. To satisfy that test, petitioners must show that they materially participated in R & L Air under another of the material participation tests for any 5 of the past 10 years.  See id. They have introduced no credible evidence that they materially participated in R & L Air under any of the tests for any of the years preceding 2003.  We conclude that petitioners do not meet the requirements of section 1.469-5T(a)(5), Temporary Income Tax Regs., supra.

In sum, we conclude that petitioners materially participated in R & L Air in 2003, and its loss during that year is not a loss from a passive activity.  R & L Air's losses are losses from a passive activity in 2002 and 2004.

D. Section 6662 Accuracy-Related Penalties

Petitioners contest the imposition of accuracy-related penalties for the tax years in issue.  Section 6662(a) and (b)(2)

imposes a 20-percent accuracy-related penalty on any underpayment of Federal income tax attributable to a substantial understatement of income tax. Section 6662(d)(1)(A) defines a substantial understatement of income tax as an amount exceeding the greater of 10 percent of the tax required to be shown on the return or $5,000.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause under section 6662(d)(2)(B) or substantial authority under section 6664(c). See Rule 142(a); Higbee v. Commissioner, supra at 446-447.

Petitioners had substantial understatements of income taxes in 2002 and 2004. With regard to those years, the amounts required to be shown on the returns were $369,406 and $1,195,660, respectively. The understatements were $369,406 for 2002 and $440,850 for 2004. The understatements each exceed 10 percent of the tax required to be shown on the respective return and $5,000. Respondent has shown that penalties are appropriate with regard to 2002 and 2004.

Because petitioners' losses from R & L Air in 2003 are not losses from a passive activity, petitioners' deficiency in Federal income tax for 2003 must be recalculated.  It appears that the recalculated deficiency will result in an understatement that exceeds 10 percent of the tax required to be shown on the return and $5,000.  Thus, the section 6662(a) accuracy-related penalty will be appropriate in 2003 also.  We need not, therefore, separately discuss negligence as a ground for the penalty.

Petitioners argue that they had substantial authority for their treatment of ResEnt and their characterization of R & L Air's losses as nonpassive.  Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."  Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Petitioners have failed to refer specifically to any of the authorities listed in section 1.6662-4(d)(3)(iii), Income Tax Regs.  The cases petitioners cite are materially distinguishable. We therefore conclude that petitioners did not have substantial authority for their tax treatment of ResEnt and R & L Air.

The accuracy-related penalty under section 6662(a) is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448.  The

decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. Reliance on professional advice may constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. To justify reliance, the taxpayer must show that the professional adviser was supplied with accurate information. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Decedent was a corporate executive for most of his professional career, and Mrs. Stangeland was involved in some of petitioners' businesses. Petitioners have not introduced evidence of Mrs. Stangeland's education, experience, or

knowledge; and because they bear the burden of proof, we cannot consider these factors in their favor.

We cannot conclude that petitioners' reliance on McCrimlisk's advice regarding the treatment of ResEnt as a trade or business under section 162 was reasonable or in good faith. Petitioners deducted through ResEnt personal investment expenses both related to their private portfolio of interests and related to new private investments. They also deducted through ResEnt the costs of flights undertaken for charitable purposes. Their claiming costs of flights that had no business purpose as business deductions is not reasonable even if blessed by a tax professional.

Petitioners apparently deducted expenses of ResEnt on Schedule C in order to avoid limitations on charitable contribution deductions and miscellaneous itemized deductions properly reportable on Schedule A. See secs. 63(a), (d), 67(a) and (b), 68(a) and (b), 170, 212. The unsupportable characterization of items as business expenses and the transparent attempt to avoid limitations on itemized deductions negate reasonable cause and good faith.

With regard to R & L Air, petitioners failed to provide McCrimlisk with all the information necessary for him to make a proper determination of petitioners' tax liabilities. McCrimlisk testified that it was his belief that decedent spent over 500

hours on R & L Air in 2002, but evidence supporting that belief was not introduced. There are numerous incorrect assumptions in the KPMG letter. The letter states that it appears more likely than not that decedent satisfies the material participation tests under section 1.469-5T(a)(3) and (7), Temporary Income Tax Regs., supra. However, that conclusion is based on the following assumptions: (1) Decedent had the sole responsibility for running the daily business and seeing to all the details of R & L Air, and (2) decedent was the only other individual performing services besides the pilot who works for the leasing company. These assumptions are incorrect. R & L Air hired Pinnacle Air Group to manage its airplanes and paid monthly fees for these management services. Pavlicek testified as to the services that Pinnacle Air Group provided R & L Air, including ensuring that the airplanes were fit to fly and that there were qualified pilots available. Petitioners have not provided any evidence that McCrimlisk was corrected regarding the business operations of R & L Air in 2004. We therefore conclude that petitioners did not act reasonably in relying on McCrimlisk's advice or on the KPMG letter because they were not based on accurate information. Petitioners are therefore liable for the accuracy-related penalties under section 6662.

To allow for further proceedings to determine decedent's basis in R & L Air and recomputation of the deficiencies and penalties in accordance with this opinion,

<u>An appropriate order will be issued</u>.