T.C. Memo. 2012-19

UNITED STATES TAX COURT

ALFRED A. AND BRENDA C. IVERSEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5300-10.                    Filed January 18, 2012.

<u>Thomas Edward Brever</u>, for petitioners.

<u>John P. Healy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' 2005 and 2006 joint Federal income taxes of $103,848
and $70,356, respectively, and accuracy-related penalties under
section 6662.[1]

_____

[1]All section references are to the Internal Revenue Code in
(continued...)

The issues for decision are whether petitioners' involvement in a Colorado cattle ranch constituted a passive activity under section 469 and, if so, whether the accuracy-related penalties should be sustained.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time of filing the petition, petitioners resided in Minnesota.

Petitioner Alfred Iversen (Mr. Iversen), as a teenager, spent summers on his grandparents' 400-acre farm and ranch near Thief River Falls, Minnesota.

Mr. Iversen served in the U.S. Navy on antisubmarine warfare planes. After military service, he earned his master's degree in mechanical engineering from the University of Minnesota.

In 1979 Mr. Iversen founded PMT Corp. (PMT), which over the years has become a large and successful manufacturer and worldwide seller of surgical and medical equipment. PMT sells its medical equipment throughout the United States and in more than 30 foreign countries. PMT is a Minnesota corporation. Petitioners own a controlling interest in the stock of PMT.

---

[1](...continued)
effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In both 2005 and 2006, as president of PMT Mr. Iversen worked more than 40 hours a week, and he received from PMT a total of approximately $6 million in salary and other income.

In 1998 petitioners formed Stirrup Ranch, LLC (Stirrup Ranch), as a limited liability company through which they purchased a 14,000-acre cattle and horse ranch (ranch) in Fremont County, Colorado, near Canon City, Colorado. Petitioners owned 100 percent of Stirrup Ranch.

The ranch is in the Colorado Rockies at an altitude of approximately 9,000 feet. The primary activity conducted by Stirrup Ranch is the commercial raising and selling of Black Angus and Hereford cattle. In addition to owning the ranch, Stirrup Ranch leases another 28,000 acres from the Bureau of Land Management. The total of the owned and leased acreage on which Stirrup Ranch grazes its cattle consists of 42,000 acres.

During 2005 and 2006 Stirrup Ranch owned approximately 300 head of cattle and 30 horses.

The main ranch house on the Stirrup Ranch property is a 20,000-square-foot lodge with a log exterior and wraparound decks. The house has a large great room with vaulted ceilings, a floor to ceiling fireplace, and leather couches and chairs. The house also includes meeting rooms, office space, a conference room, a recreation room, and a number of bedrooms and bathrooms.

In 2005 and 2006 Stirrup Ranch employed full time on its property in Colorado two individuals--a ranch manager and a ranch hand. Over the course of 2005 and 2006 Stirrup Ranch employed three different ranch managers. Seasonally, Stirrup Ranch employed onsite at the ranch additional ranch hands. The Stirrup Ranch ranch manager lives on the ranch property in a house separate from the lodge.

A job description for the onsite Stirrup Ranch ranch manager, written by one of the ranch managers (and which the parties stipulate is a "description of the ranch manager's general duties during 2005 and 2006") states as follows:

> The ranch manager is responsible for all ranching operations on the 42,000 total acres of the Stirrup Ranch. This includes but is not limited to 5 major categories: livestock management; natural resource management; maintenance and improvement projects; employee and subcontractor supervision; and working with government agencies (BLM, State Land board and US Forest Service) on our leased lands.
>
> A few of the ranch goals that [the ranch manager is] continually working toward are: maximizing hay meadow production; water development; and increasing stocking rate. Besides the year-round Stirrup Ranch head of cattle [the ranch manager] also custom graze[s] other peoples' cattle to increase seasonal pasture utilization and cash flow. [The ranch manager's] responsibilities require * * * at least 60 hrs/week.

During 2005 and 2006 petitioners spent almost all of their time in Minnesota--Mr. Iversen performing his executive responsibilities as president of PMT.

While in Minnesota Mr. Iversen also would make and receive telephone calls and send and receive emails and faxes relating to Stirrup Ranch matters. In evidence for 2005 are telephone records which indicate that Mr. Iversen made telephone calls lasting a total of 3.75 hours to locations in Colorado using PMT's telephones. No telephone records were offered into evidence relating to 2006, and no telephone records were offered into evidence relating to petitioners' home and mobile phones for either 2005 or 2006.

In evidence for 2005 are four emails or faxes relating to Stirrup Ranch sent to Mr. Iversen from employees working at the ranch in Colorado. For 2006 there are in evidence three emails or faxes to Mr. Iversen relating to Stirrup Ranch sent from employees working at the ranch in Colorado.

During 2005 and 2006 the onsite Stirrup Ranch ranch manager did not have general check signing authority for Stirrup Ranch; rather, Mr. Iversen retained for himself Stirrup Ranch check signing authority. Occasionally, Mr. Iversen would grant a power of attorney authorizing the ranch manager to sign Stirrup Ranch checks. The canceled checks of Stirrup Ranch that are in evidence for 2005 indicate that many of the checks signed by Mr. Iversen were routine salary checks for the ranch manager and the ranch hand. For 2006 no record of Stirrup Ranch checks is in evidence.

During 2005 and 2006, on each occasion when he traveled from Minnesota to Colorado to visit the ranch, Mr. Iversen did so on a private NetJets airplane paid for by PMT.[2]  These flights originated from the Minneapolis-St. Paul airport and terminated at the Pueblo, Colorado, airport.

According to a NetJets airplane flight tracking record in evidence, during 2005 Mr. Iversen made 11 trips to the ranch, and (not counting outbound travel days from Minneapolis to Pueblo, Colorado, because of his late arrival) he spent a total of 23 days onsite in Colorado at the ranch.  On 19 of those days one or more of petitioners' children accompanied Mr. Iversen to the ranch on the NetJets airplane.

According to a handwritten list petitioners prepared for trial, during 2006 Mr. Iversen made 11 trips to the ranch and spent 19 days onsite at the ranch (again not counting outbound travel days).[3]  The evidence does not indicate who traveled with Mr. Iversen to the ranch in 2006.

---

[2]In August 2006 on one trip to the ranch petitioners drove a truck.

[3]For 2006 no airplane flight tracking record regarding Mr. Iversen's airplane trips to the ranch was provided to respondent, and none was offered into evidence.  However, the handwritten list of Mr. Iversen's 2006 flights to the ranch was prepared by petitioners and conditionally admitted into evidence.  After trial petitioners apparently provided to respondent a flight record of Mr. Iversen's flights to the ranch in 2006.  Respondent points to a number of minor discrepancies between the handwritten list and the 2006 flight record provided after trial and objects to admission of the handwritten list on grounds of hearsay and lack of foundation.  The discrepancies appear to be minor, and we overrule respondent's objection to Exhibit 13.

Occasionally in 2005 and 2006 Mr. Iversen hosted at the ranch PMT employees, sales representatives, clients, and potential clients. The PMT guests at the ranch would have meetings relating to PMT business, and they would hunt elk and other wildlife. The guests would stay overnight in the ranch lodge.

Mr. Iversen would participate in the PMT meetings conducted at the ranch, and he occasionally would hunt on the ranch with PMT employees, other guests, and family members.

While at the ranch, Mr. Iversen also would assist the ranch manager and ranch hand with various ranch chores--mending fences; rounding up cattle; branding, inoculating, and castrating cattle; and cleaning the barn.

Documents in evidence relating to Stirrup Ranch's leases of Federal grazing land designate Mr. Iversen as "permittee/ licensee" and the onsite Stirrup Ranch ranch manager as "ranch manager".

For her part, while at the ranch in 2005 and 2006 Mrs. Iversen participated in some activities relating to the family, the cattle, and the horses.

While visiting the ranch in 2005 and 2006, other Iversen family members occasionally would assist with ranch chores.

Neither Mr. Iversen nor Mrs. Iversen maintained a log, a diary, notes, or other record of the work they performed on a

day-to-day basis relating to Stirrup Ranch--whether performed onsite at the ranch in Colorado or in Minnesota.

In 2005 and 2006 neither petitioner received any salary or wages for work relating to Stirrup Ranch.

Petitioners' 2005 and 2006 joint Federal income tax returns were prepared and filed on their behalf by Martin Nergaard, who is an attorney, a certified public accountant, the director of a regional accounting firm, and a former Internal Revenue Service employee. Mr. Nergaard concluded that under the passive loss rules of section 469 Mr. Iversen in 2005 and 2006 materially participated in the activities of Stirrup Ranch, and Mr. Nergaard prepared petitioners' 2005 and 2006 joint Federal income tax returns accordingly, claiming loss deductions for Stirrup Ranch of $288,066 for 2005 and $197,077 for 2006.

On audit respondent concluded that Mr. Iversen did not materially participate in the activities of Stirrup Ranch, disallowed the loss deductions claimed relating to Stirrup Ranch, and determined the $103,848 and $70,356 deficiencies in petitioners' respective 2005 and 2006 Federal income taxes and the section 6662 accuracy-related penalties.

OPINION

For purposes of the limitation under section 469 on losses from passive activities, material participation is defined as

involvement in an activity on a regular, continuous, and substantial basis.  Sec. 469(h)(1)(A)-(C).

Activity performed in an individual's capacity as an investor does not qualify as participation in an activity, unless the individual is directly involved in the day-to-day management of the activity.  Sec. 1.469-5T(f)(2)(ii)(A) and (B), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).  Investor-related activities not qualifying as material participation include:  (1) Studying and reviewing financial statements or reports on operations; (2) preparing or compiling summaries or analysis of the finances or operations of the activity for the individual's own use; and (3) monitoring the finances or operations of the activity in a nonmanagerial capacity.  Id.

Participation in an activity may be shown by any reasonable means, including calendars, appointment books, or narrative summaries identifying work performed and the approximate number of hours spent performing the work.  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra.

Contemporaneous daily time reports, logs, or similar documents are not required if other reasonable means exist of establishing a taxpayer's participation.  Id.

Under the 500-hour test of subparagraph (1) and under the facts and circumstances test of subparagraph (7) of section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb.

25, 1988), petitioners contend that in 2005 and 2006 they materially participated in the management and activities of Stirrup Ranch on a regular, continuous, and substantial basis.[4]

Respondent emphasizes that under section 1.469-5T(b)(2)(ii)(A) and (B), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), a taxpayer's management activities under the facts and circumstances test shall not be taken into account if another person also receives compensation for management services relating to the activity or if another person performs more management services (by time) relating to the activity than the taxpayer.

Petitioners claim that in spite of the fact that a ranch manager was employed onsite at the ranch, Mr. Iversen was the real day-to-day ranch manager and he made essentially all of the significant decisions relating to the operation, activities, and management of Stirrup Ranch.

Petitioners claim that when he was at the ranch Mr. Iversen worked from dawn to dusk on Stirrup Ranch matters and that when he was in Minnesota (in order to keep up on the details of all

---

[4]Petitioners acknowledge that they do not meet the tests relating to regular, continuous, and substantial participation set forth in subpars. (2) and (3) of sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), and no evidence indicates that petitioners meet the tests set forth in subpars. (4), (5), and (6) of sec. 1.469-5T(a), Temporary Income Tax Regs., supra.

significant aspects of Stirrup Ranch and make practically all decisions relating to the operation, activities, and management of Stirrup Ranch) Mr. Iversen spent 2 to 3 hours a day on telephone calls, emails, and fax communications with the onsite Stirrup Ranch ranch manager.

Petitioners claim that in each of 2005 and 2006, whether at the ranch in Colorado or from petitioners' home in Minnesota, Mr. Iversen spent a total of at least 400 hours working on matters relating to Stirrup Ranch, Mrs. Iversen spent at least another 100 to 150 hours working on matters relating to the horses at the ranch, and that they together meet the 500-hour test of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra.[5]

Mr. Iversen describes his involvement with Stirrup Ranch activities as follows:

> [The onsite Stirrup Ranch ranch manager and ranch hand] do nothing without telling me, and they cannot buy anything, negotiate anything, kill anything, shoot anything, and I lay down the rules as far as what they're supposed to do.

Our analysis of the time and activity petitioners spent in 2005 and 2006 working on matters relating to Stirrup Ranch is made difficult by the lack of meaningful contemporaneous or other

---

[5]Under subpar. (3) of sec. 1.469-5T(f), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), Mrs. Iversen's participation in the activities of Stirrup Ranch count under both the 500-hour and the facts and circumstances tests of sec. 1.469-5T(a)(1) and (7), Temporary Income Tax Regs., 53 Fed. Reg. 5725, 5726 (Feb. 25, 1988).

records and documentation regarding specifically what petitioners did on a day-to-day basis and how much time they spent on matters relating to Stirrup Ranch. In this case, the lack of records and documentation are not cured by estimates made years after the fact in writing or by testimony. See Goshorn v. Commissioner, T.C. Memo. 1993-578.

Petitioners acknowledge that some portion of their time while at the ranch in Colorado (when PMT employees and clients and petitioners' family were present) was spent on activities relating to PMT and the family, not on Stirrup Ranch's cattle and horse activities.

While he was in Minnesota Mr. Iversen clearly was busy with his responsibilities as president of PMT, and the documented record in this case is particularly thin as to how much time Mr. Iversen spent on Stirrup Ranch matters--whether in Minnesota or Colorado.

The fact that the airplane flights from Minnesota to the ranch were paid for by PMT indicates to us that Mr. Iversen's time spent at the ranch often and primarily related to the affairs of PMT, not to the management and activities of Stirrup Ranch.

The airplane logs in evidence for 2005 indicate that during 4 months of 2005, Mr. Iversen made no trips to the ranch and that he was at the ranch for 1 day in each of April, June, September,

and October 2005.  According to the airplane flight logs, on each trip to Stirrup Ranch in 2005 on which Mr. Iversen stayed at the ranch more than 1 day, an Iversen family member went along.

The evidence does not indicate those occasions when Mr. Iversen was at the ranch without PMT employees and/or clients also being present.

Telephone records that are in evidence do not support petitioners' claim that Mr. Iversen spent frequent and numerous hours on the phone while in Minnesota talking to the Stirrup Ranch ranch manager in Colorado about Stirrup Ranch activities or any other subject.

If, in spite of the fact that there was an onsite Stirrup Ranch ranch manager, Mr. Iversen was running, supervising, managing, and involved with all significant activities of Stirrup Ranch, as petitioners seem to claim, we would expect petitioners to have offered into evidence extensive files, to-do lists, home and mobile phone records, business plans, project descriptions, instructions to employees, etc., documenting and establishing Mr. Iversen's active involvement in the regular, continuous, and substantial management and day-to-day activities of Stirrup Ranch.  That documentary evidence is absent.

We do not doubt that while in Minnesota Mr. Iversen spent time on Stirrup Ranch activities--talking on the telephone to the ranch manager, reading articles on cattle ranching, receiving

bills and correspondence, and writing checks in payment of ranch bills.  Also, we acknowledge that while in Colorado at the ranch Mr. Iversen participated and assisted with the cattle operation, ranch maintenance, and improvements.

However, the weight of the evidence before us does not establish that during 2005 and 2006 petitioners spent anywhere near 500 hours on Stirrup Ranch activities, that petitioners engaged in regular, continuous, and substantial activities relating to Stirrup Ranch, or that petitioners materially participated in the activities of Stirrup Ranch as required under section 469 and the related regulations.

Further, a significant portion of the time Mr. Iversen spent on Stirrup Ranch activities appears to have been more in the capacity of an investor not involved in the day-to-day activities and which therefore would not count under the facts and circumstances test.  See sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.  The presence at the ranch of a full-time paid ranch manager for most of 2005 and 2006 disqualifies much of Mr. Iversen's time working on Stirrup Ranch activities from counting under the facts and circumstances test.

We sustain respondent's deficiency determinations herein for both 2005 and 2006.

With regard to the section 6662(a) accuracy-related penalties for 2005 and 2006 that respondent determined, we are

persuaded that petitioners had good faith and reasonable cause in claiming the losses that we disallow.

Petitioners credibly testified that they believed the claimed losses qualified under the active participation rules of section 469. Petitioners' testimony was supported by the testimony of their accountant.

Petitioners' accountant should have known better, particularly if the accountant was shown no more evidence and documentation than was shown to us. Regardless of the incorrectness of their accountant's advice, we conclude that petitioners reasonably and in good faith relied on their accountant in claiming the losses disallowed. We reject respondent's determination of the section 6662(a) accuracy-related penalties.

Decision will be entered

under Rule 155.