T.C. Memo. 2014-158

UNITED STATES TAX COURT

SCOTT WESLEY WILLIAMS AND MICHAELE ANNA WILLIAMS,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4640-12.                    Filed August 5, 2014.

Scott Wesley Williams and Michaele Anna Williams, pro sese.

Donna F. Herbert, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  Mr. Williams is an aviation buff who owns a business that is

unrelated to aviation.  He purchased an airplane that he made available for rent,

used for personal purposes, and used in his other business.  On the Williamses'

joint tax returns, they offset losses related to the ownership of the airplane against

[*2] their income from the other business.  Respondent disallowed those offsets

and issued a notice of deficiency addressing that issue and others, determining

deficiencies for 2006 and 2007 and an accuracy-related penalty for 2007 as

follows:[1]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|---------------------|
| 2006 | $27,696 | --- |
| 2007 | 17,520 | $3,504 |

The 2006 deficiency is no longer at issue.  The issues remaining for decision

are:  (1) whether the airplane activity in 2007 is properly combined with Mr.

Williams' other business for purposes of the passive activity rules of section 469;

(2) whether the Williamses may deduct losses on the airplane activity for 2007 in

excess of the income from that activity; and (3) whether the Williamses are liable

for an accuracy-related penalty for 2007.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[*3]**                          FINDINGS OF FACT

The Williamses resided in California at the time they filed their petition. Mrs. Williams is a registered nurse who does not work for any of Mr. Williams' businesses.

Mr. Williams' interest in aviation is apparent. He received his private pilot's license in 1987 and his commercial pilot's license in 1990. Mr. Williams is a former U.S. Air Force officer. He has a master's degree in space studies from the University of North Dakota and a master's of business administration in aviation. He maintains a part-time law practice focusing on business and aviation law. In December 2006 Mr. Williams purchased an airplane through his business, Worldwide Phone Pops (WPP).

WPP is a telephone skills training business first established by Mr. Williams' father in 1982. When Mr. Williams left the U.S. Air Force in 1992, he began working for his father at WPP. Mr. Williams started conducting his own training seminars in 2000.

To avoid "the notorious pat downs and searches and baggage claim and lost baggage with the airlines", Mr. Williams asked his father for and received permission to charter airplanes to travel to customers' locations instead of taking commercial flights. At that time Mr. Williams began renting airplanes from a

[*4] flight school and flying the airplanes himself. Eventually he and his father determined that it was not cost effective to charter flights, and he stopped chartering flights in 2001. Mr. Williams purchased WPP from his father in 2004. Once he owned WPP, Mr. Williams began flying himself again.

Mr. Williams keeps very busy. In addition to spending more than 2,000 hours running WPP, he operated a law practice out of the same office as WPP in 2007. He also actively participated in the rental of five properties that he owned in 2007.

Airplane Acquisition

In November 2006 Mr. Williams attended the Aircraft Owners and Pilots Association Expo where he spoke to several airplane manufacturers about purchasing an airplane. Mr. Williams researched the fixed expenses of owning an airplane and determined that it was not "a good financial decision" for WPP. He then attended an aviation tax seminar at the Expo "describing how a leaseback arrangement can be structured such that it becomes active, meeting either a 500-hour or a 100-hour material participation rule." He came to believe that if a leasing activity was properly structured and carried out, the losses the airplane generated could be used to offset ordinary income.

**[\*5]**   After the seminar, Mr. Williams read Web sites and books "studying and essentially mastering the deductibility of a general aviation airplane in a business in conjunction with a flight school leaseback arrangement." He testified that at some later date he purchased two books written by Raymond C. Speciale, one of the people who had spoken at the aviation tax seminar.

In late November 2006 a sales executive at Cirrus Design, an airplane manufacturer, introduced Mr. Williams to Larry Hester of Sky Blue Air, an aircraft rental company and flight school. Mr. Hester estimated that flight school airplanes typically rent out between 30 and 50 hours per month. Mr. Williams figured that 30 hours of rental income would be a break-even point for owning an airplane from a cashflow perspective. In December 2006 Mr. Williams caused WPP to purchase a Cirrus airplane.

Flight Schools

On December 15, 2006, Mr. Williams on behalf of WPP signed an aircraft marketing agreement with Sky Blue Flight School (Sky Blue) to market and rent WPP's airplane to prospective flyers. The airplane went on Sky Blue's flight line in January 2007. Sky Blue did not produce the estimated 30 to 50 hours of rental income and because of financial difficulties closed in November 2007. In early November 2007 WPP signed an aircraft marketing agreement with a new flight

[*6] school, Mach 1 Aviation, Inc. (Mach 1), to market and rent WPP's airplane to prospective flyers. Jason Price owned and operated Mach 1. As Sky Blue was closing, Mr. Williams and Mr. Price convinced two pilot trainees to continue their training with Mach 1. WPP's airplane was the only airplane to which Mach 1 had access in 2007. In November and December 2007 Jason Price worked at Mach 1 full time.

During 2007 the airplane was used for a total of 384.3 hours: 58.4 hours by Mr. Williams for personal reasons, 55.7 hours by WPP, 197.3 hours by Sky Blue, and 72.9 hours by Mach 1.[2] The logs Mr. Williams provided for 2007 are not complete logs of the airplane's use; rather they list the trips where Mr. Williams flew the airplane either for his personal use or for WPP.

Aircraft Marketing Agreements

WPP entered into aircraft marketing agreements with Sky Blue and with Mach 1. Both aircraft marketing agreements were drafted by Mr. Williams and were for indefinite periods; each had a start date but no end date. Under the agreements, Mr. Williams had to request time on the airplane; he could not

---

[2]The parties have stipulated that the total hours of use in 2007 was 385.3; however, the breakdown in the stipulation and the corresponding exhibit reflects that the correct total is 384.3 hours.

[*7] unilaterally oust a student who had already booked the airplane.[3] In fact, Mr. Williams testified that, on occasion, he would rent another airplane for his or WPP's use because he could earn more from leasing WPP's airplane than he would pay to rent another airplane.

Sky Blue Agreement

Mr. Williams reviewed and revised the aircraft marketing agreement with Sky Blue. The agreement required Sky Blue to maintain a schedule book for the airplane, to promote the use of the airplane, to act as collection agent for the owner, to schedule flights and training, to arrange for fuel and oil, to tie down the airplane when not in use, and to wash the airplane weekly if the owner did not wash it. The agreement also required that Sky Blue become a Cirrus service center so that it could perform warranty maintenance on WPP's airplane. Indeed, Sky Blue performed warranty maintenance on WPP's airplane and billed WPP for that maintenance in 2007; Mr. Williams specifically recounted two instances when Sky Blue billed WPP for work that should have been covered by warranty.

The Sky Blue agreement required WPP to arrange for inspections and maintenance and to pay expenses, including licenses, taxes, and insurance.

---

[3]In the agreement with Mach 1, WPP had the exclusive right to reserve the airplane more than 30 days in advance of the date of use.

[*8] Further, WPP paid Sky Blue a marketing fee of $25 per hour flown in the airplane by customers of the flight school. Mr. Williams also included the following provision in the marketing agreement with Sky Blue:

> [Sky Blue] acknowledges that it is the Owner's intent to meet the IRS test for material participation in this activity. Accordingly, [Sky Blue] agrees that no one of its principals or employees will devote more than 100 hours per year to the Owner's aircraft or leasing activities.

Mach 1 Agreement

The agreement with Mach 1 placed many more obligations on Mach 1 than the previous agreement had placed on Sky Blue. The agreement with Mach 1 required it to maintain insurance on the airplane, to maintain the master schedule via its own scheduling system, to collect rental fees and fuel surcharges, to coordinate with WPP to ensure that maintenance was done, to track the tachometer, to maintain FAA requirements and governmental licenses for flight schools, and to calculate monthly income. It also required Mach 1 to provide a detailed financial statement itemizing income and expenses, including "the physical Aircraft flight log pages in which Renters and Flight School instructors record their name and starting/ending Hobbs time." The aircraft marketing agreement further obligated Mach 1 to "require all Renters to execute a rental agreement * * * that strongly encourages Renters to purchase their own

[*9] insurance", to require the renter to pass minimum proficiency standards as specified by Mach 1 or its insurance carrier, and to promptly report damage or injury to the aircraft, renter, or flight school agent to WPP. Further, Mach 1 was to "undertake reasonable commercial efforts to ensure the Aircraft rents out as many hours as possible", to "communicate regularly with Owner about the Aircraft's rental status and rental projections", and to "disclose any material changes in Flight School's operations that would adversely impact the Aircraft's future rental revenue."

Under the second agreement, WPP had three obligations: pay expenses, ensure the airworthiness of the airplane, and update the airplane's navigation database. Further, WPP paid Mach 1 a marketing fee on a graduated schedule based on the number of hours the airplane was rented by customers of the flight school. Mr. Williams also included the following provision in the marketing agreement with Mach 1:

> [Mach 1] acknowledges that it is the Owner's intent to meet the IRS test for material participation in this activity. Accordingly, * * * [Mach 1] agrees that none of its employees or agents will devote more than 100 hours per year to the marketing and management of Aircraft. This does not restrict the number of hours per year that any single flight instructor may provide instruction in Aircraft.

[*10] <u>Mr. Williams' Participation in 2007</u>

Mr. Williams performed a variety of tasks relating to WPP's ownership of the airplane. He downloaded the updates to the navigation system, coordinated maintenance, hired people to wash and wax the airplane, drafted both aircraft marketing agreements, rewrote two template contracts that the flight schools used with individual renters, assisted Sky Blue and Mach I in marketing the airplane, had meetings with other flight schools about transferring the airplane, tried to convince Sky Blue renters to rent with Mach 1 when Sky Blue ceased operations, wrote a one-page flyer for use by Sky Blue, and wrote a one-page list of special instructions for the airplane. Mr. Williams estimated he spent approximately 150 hours solely on the airplane activity in 2007. Although Mr. Williams is a practicing attorney and likely is familiar with the practice of tracking his hours, he did not provide a log of his hours spent on the airplane activity, not even for the amount of time he spent drafting legal documents such as the aircraft marketing agreements.

Mr. Williams downloaded the updates to the navigation system twice a month, often when he was flying the airplane. Mr. Williams coordinated and approved all airplane maintenance through the flight schools. The maintenance schedule was based on the number of hours the airplane was flown, and Mr.

[*11] Williams received flight logs that showed the hours flown. He also received payments from the flight schools based on hours of use by renters.

Mr. Williams did not provide the Court with any documents corroborating what maintenance was done on the airplane in 2007 or the time that he spent on its coordination. Further, Mr. Williams did not provide to the Court the flight logs he received from the flight schools that could corroborate when regular maintenance would have been performed. Rather, he provided a document he described as his 2007 flight log that lists only his use of the airplane, either for personal use or for WPP. This partial flight log does not list any use by pilot trainees or by flight instructors as was required by the second aircraft marketing agreement. Both Messrs. Williams and Price testified that the airplane would have maintenance after every 100 hours of flight time; given that the parties have stipulated that the airplane was flown 384.3 hours, it appears the airplane needed scheduled maintenance three times in 2007.

Mr. Williams hired people to wash and wax the airplane. He provided no contracts or invoices for such work, nor did he testify as to how much time he spent hiring people.

Mr. Williams drafted both aircraft marketing agreements, which he submitted to the Court. He testified that when each flight school presented him

[*12] with the template contract it used with the individual pilots, he rewrote the template to protect WPP from liability. The Court has no evidence as to how much time Mr. Williams spent drafting the agreements. And he did not provide either of the original template contracts or his revised versions from which the Court might glean how much effort went into the revisions.

Mr. Williams claims to have spent more than 25 hours having dinner with Mr. Hester in January and February 2007 discussing how to better market WPP's airplane. He did not provide any contemporaneous records to corroborate these dinner meetings other than a one-page flyer to market WPP's airplane.

Also in 2007 Mr. Williams had "extensive discussions" with Mr. Hester regarding bills for maintenance that should have been covered by the airplane's warranty. Mr. Williams also had one of WPP's employees deal with the disputed invoices and payments to and from Sky Blue. He did not provide any of the disputed invoices, or any invoices or statements, from Sky Blue.

After Mr. Hester told Mr. Williams Sky Blue was closing, and before he decided to work with Mach 1, Mr. Williams spoke with three other flight schools. The most significant discussion appears to have been a one-hour meeting with Channel Islands Aviation.

[*13]  Mr. Williams had a three-hour meeting with Mr. Price of Mach 1 discussing the terms of the aircraft marketing agreement, which Mr. Price corroborated.  Mr. Williams testified that he spent over 10 hours poring through student records and calling students of Sky Blue and asking them to continue to train in the airplane with Mach 1.  He provided no corroborating evidence.

Mr. Williams testified that Mach 1 was "more tech savvy" and did a great deal of marketing and advertising for itself and for the airplane, including on their Web site.  Mach 1 was so successful with its Web site that it generated many phone calls from prospective flyers of the airplane.  Mr. Williams testified that he worked on the marketing of the airplane with Mr. Price, but he did not specify how he worked on the marketing.

Mr. Williams also provided a list of "special instructions" for renters of the airplane, which included instructions on how to properly fill the fuel tank, how to plug in headsets, and how to adjust the seats, plus an admonition not to step on the leather seats.  Mr. Williams also once "threw * * *[a pilot trainee] out of Mach 1" because he left a candy wrapper in the airplane.

Forms 1040 and the IRS' Adjustments

The Williamses filed a joint Form 1040, U.S. Individual Income Tax Return, for each year.  For 2006 Mr. Williams claimed depreciation and a section

**[*14]** 179 expense deduction for the airplane purchased in December 2006.  For 2007 Mr. Williams reported the airplane income and expenses on the Schedule C, Profit or Loss From Business, for WPP, his law practice on a separate Schedule C, and his rental real estate on a Schedule E, Supplemental Income or Loss.

On November 29, 2011, respondent issued a notice of deficiency to the Williamses for 2006 and 2007. The adjustment for 2006 reduced the allowable amount of the section 179 expense deduction because of reduced business use. The parties stipulated that the 2006 adjustment is no longer at issue.  For 2007 respondent determined that the airplane activity was a passive activity that was not properly included as part of the Schedule C for WPP, and instead respondent moved the airplane activity to the Schedule E for rental property.  Additionally, respondent determined an accuracy-related penalty pursuant to section 6662(a) for 2007.  The Williamses dispute the adjustments for 2007, and we address the recharacterization of the airplane activity and the accuracy-related penalty in turn.

**[*15]**                                      OPINION

Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving those determinations wrong.[4] Income tax deductions are a "matter of legislative grace", and the burden of proving entitlement to any claimed deduction rests on the taxpayers.[5] Further, taxpayers are required to maintain sufficient records to "show whether or not such person is liable for tax".[6]

At trial Mr. Williams touched on the issue of the burden of proof. One of the tests under the section 469 regulations requires that no person spend more time on the activity at issue than the taxpayer.[7] Mr. Williams repeatedly stated at trial and in his briefs that he does not have to "disprove a negative",[8] namely that no person or entity spent more time on the airplane activity than he did. Mr. Williams' interpretation of the regulations is incorrect. In deduction cases the

---

[4]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[5]Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

[6]See sec. 6001.

[7]Sec. 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

[8]We interpret this phrase to mean that he does not have to prove a negative.

[*16] taxpayer is not required to prove a negative but rather must adduce positive evidence to establish his entitlement to a particular deduction.[9]   Although in some situations the Commissioner has the burden of proof, in this situation the taxpayer retains the burden of proof.[10]   Therefore, Mr. Williams has the burden to show that he is entitled to deductions for the airplane activity in excess of the income he received from that activity.

Section 469 Passive Activity Losses

Congress designed section 469 to prevent taxpayers from reducing taxable nonpassive income by losses attributable to passive activities.[11]   A passive activity loss is the amount (if any) by which the aggregate losses from the taxpayer's passive activities exceed the aggregate income from the passive activities for such year.[12]   Section 469 generally prohibits deducting passive activity losses from

---

[9]Beck v. Commissioner, 74 T.C. 1534, 1548 (1980), aff'd, 678 F.2d 818 (9th Cir. 1982).

[10]Karme v. Commissioner, 673 F.2d 1062, 1065 (9th Cir. 1982) (citing Herbert v. Commissioner, 377 F.2d 65, 71 (9th Cir. 1966), rev'g T.C. Memo. 1964-223), aff'g 73 T.C. 1163 (1980).

[11]See Hillman v. Commissioner, 118 T.C. 323, 329 (2002); Langille v. Commissioner, T.C. Memo. 2010-49, aff'd, 447 Fed. Appx. 130 (11th Cir. 2011).

[12]Sec. 469(d)(1).

[*17] unrelated income, thus permitting passive losses to offset only passive income.[13] Disallowed passive activity losses are not lost; rather, they are deferred or suspended and are available as a deduction against income from that activity for the next taxable year.[14] A passive activity is an activity involving the conduct of a trade or business in which the taxpayer does not materially participate.[15]

Section 469 does not define "activity".[16] The Secretary, however, has prescribed regulations pursuant to section 469(l) that specify what constitutes an "activity". Section 1.469-4(c), Income Tax Regs., sets rules for determining what constitutes a single "activity". That regulation provides: "One or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469."[17] Whether activities constitute an "appropriate economic unit" depends on the facts and circumstances, giving the following five factors the greatest weight:

---

[13]Langille v. Commissioner, T.C. Memo. 2010-49 (citing Schwalbach v. Commissioner, 111 T.C. 215 (1998)).

[14]Sec. 469(b).

[15]Sec. 469(c).

[16]See Schwalbach v. Commissioner, 111 T.C. at 223.

[17]Sec. 1.469-4(c), Income Tax Regs.

**[*18]**          (i)   Similarities and differences in types of trades or businesses;

(ii)   The extent of common control;

(iii)   The extent of common ownership;

(iv)   Geographic location; and

(v)   Interdependencies between or among the activities (for example, the extent to which the activities purchase or sell goods between or among themselves, involve products or services that are normally provided together, have the same customers, have the same employees, or are accounted for with a single set of books and records.)[18]

There are no similarities between the business of renting an airplane and that of telephone sales training. The priority for the airplane activity was rental to other pilots and pilot trainees. In contrast, WPP has been in the business of training dealerships' employees about phone sales since 1982. There is no apparent nexus between these businesses, and Mr. Williams did not identify any meaningful nexus.

Common control and ownership and geographic location shed little light on this case. Mr. Williams owns and controls WPP, which in turn owns and controls the airplane. And although the airplane was housed at two airports close to WPP,

---

[18]Sec. 1.469-4(c)(2), Income Tax Regs.

[*19] those locations were also convenient to Mr. Williams; neither airport is more than 30 miles from Mr. Williams' home or business address.

That brings us to interdependence. The only sign of interdependence of the airplane business and the business of WPP is that WPP's ownership of the airplane helped Mr. Williams avoid "the notorious pat downs and searches and baggage claim and lost baggage with the airlines." The fact that there was no meaningful interdependence between the ownership of the airplane and the business of WPP is evidenced in part by the fact that Mr. Williams would rent another airplane for travel because he could earn more from renting WPP's airplane to other pilots or pilot trainees than he would pay if he or WPP rented another airplane for a trip. Further, most of the airplane's use and income came from renting the airplane outside WPP, which had no effect on the business of WPP. Likewise, there is no indication that the airplane activity depended on WPP; it was only an occasional user of the airplane. There is no evidence that WPP and the airplane activity had any of the same customers or that the two activities were integrated in any meaningful way.

After review of the factors, the commonalities begin and end with Mr. Williams. The facts and circumstances lead us to conclude that the airplane and

**[\*20]** WPP do not constitute an appropriate economic unit.  Therefore, we look at the airplane activity separately to determine whether the activity is passive.

Per Se Rental

Rental activities are generally considered to be passive regardless of material participation.[19]  A "rental activity" is one in which payments are principally for the use of tangible property.[20]  One exception is if "[t]he average period of customer use for such property is seven days or less".[21]  Mr. Williams asserts that the airplane activity meets this exception because the parties have stipulated that the "average rental period of use of the Aircraft by the individual customers of the flight schools was less than 7 days."  Therefore Mr. Williams is asserting that the customers are the individual pilots and cites Goshorn v. Commissioner, T.C. Memo. 1993-578.

In Goshorn, the Court found that the taxpayer entered into an agreement with a marina to rent out his boat for charter and that each charter averaged two days.  It appears the parties in that case agreed that the average period of customer

_____

[19]Sec. 469(c)(2).

[20]Sec. 469(j)(8).

[21]Sec. 1.469-1(T)(e)(3)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).

[*21] use was that of the individual charters because the Court made no findings on that issue, and the only question presented to the Court was whether the taxpayer materially participated. Here, respondent asserts that the only customers of the airplane activity were the flight schools, each of which rented the aircraft for months.

Respondent cites Frank v. Commissioner, T.C. Memo. 1996-177, wherein the Court found that the taxpayer rented an airplane to a pilot association and then to a flight training school that then rented the airplane to pilot trainees, and found that the activity was a rental activity. The Court was persuaded that the activity was a rental activity because the airplane was held by the pilot association and the flight school for use by customers and services were not the dominant element of the relationship.

We need not determine whether the customer is properly the pilot trainees or the flight schools, because even if we assume Mr. Williams has met the exception and the airplane activity is not per se rental, Mr. Williams must still show that he materially participated in the airplane activity, and he did not.

[*22] Material Participation

Material participation is defined generally as regular, continuous, and substantial involvement in the business operations.[22]  The regulations identify these seven situations in which an individual will be treated as materially participating in an activity:

(1)    The individual participates in the activity for more than 500 hours during the year;

(2)    The individual's participation in the activity for the taxable year constitutes substantially all of the participation in the activity of all individuals * * * for such year;

(3)    The individual participates in the activity for more than 100 hours during the taxable year, and the individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual * * * for such year;

(4)    The activity is a significant participation activity * * * for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5)    The individual materially participated in the activity * * * for any five taxable years * * * during the [preceding] ten taxable years * * *;

(6)    The activity is a personal service activity * * *, and the individual materially participated in the activity for any three taxable years * * * preceding the taxable year; or

---

[22]Sec. 469(h)(1).

**[*23]** (7)    Based on all of the facts and circumstances * * *, the individual participates in the activity on a regular, continuous, and substantial basis during such year.[23]

The regulations also provide that the last-described "facts and circumstances" test requires that the individual's participation in the activity exceed 100 hours during the taxable year.[24]   The regulations provide that "[t]he extent of an individual's participation in an activity may be established by any reasonable means."[25]

> Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means.  Reasonable means * * * may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, <u>based on appointment books, calendars, or narrative summaries</u>.  [Emphasis added.[26]]

Although "reasonable means" may be interpreted broadly, "a postevent 'ballpark guesstimate'" will not suffice.[27]

---

[23]Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).

[24]Sec. 1 .469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

[25]Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

[26]Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., <u>supra</u>.

[27]<u>Moss v. Commissioner</u>, 135 T.C. 365, 369 (2010) (citing <u>Bailey v. Commissioner</u>, T.C. Memo. 2001-296, and <u>Goshorn v. Commissioner</u>, T.C.

(continued...)

[*24] Mr. Williams asserted at trial and on brief that he meets the first, third, and seventh of these tests. He has asserted he meets the 500-hour test only because he spent more than 2,000 hours running WPP in 2007. We have already concluded that the airplane activity is not properly grouped with WPP, and Mr. Williams has not asserted that he independently spent more than 500 hours on the airplane activity in 2007. Accordingly, Mr. Williams does not meet the first test.

Work done in the taxpayer's capacity as an investor in the activity is not treated as participation in the activity unless that person is directly involved in the day-to-day management or operations of the activity.[28] Work as an investor includes study and review of financial statements, preparing summaries or analyses of finances or operations, and monitoring the finances or operations in a nonmanagerial capacity.[29] Mr. Williams asserts he was involved in the activity almost daily primarily because he would argue about the maintenance bills. The review of the bills is work done in the capacity of an investor and is not treated as

---

[27](...continued)
Memo. 1993-578).

[28]Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., supra.

[29]Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.

[*25] participation in the airplane activity.[30]  Removing the time Mr. Williams

spent arguing about bills leaves very few remaining hours he could corroborate

that he actually spent on the airplane activity in 2007.

Both the third and the seventh tests require that Mr. Williams have spent

more than 100 hours on the airplane activity.  Mr. Williams has not corroborated

that he spent more than 100 hours on the airplane activity exclusive of his time

spent as an investor.  Moreover, his own testimony coupled with that of Mr. Price

showed that Mr. Price spent more time on the airplane activity in the few months

the airplane was with Mach 1 than Mr. Williams spent on the activity in the entire

year of 2007.  Therefore, we conclude that Mr. Williams has not met any of the

tests for material participation in 2007, and we sustain respondent's

recharacterization of the airplane activity as passive.  The Williamses may not

currently deduct losses with respect to the airplane activity in excess of the

activity's income.[31]

---

[30]Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income, Tax Regs.,supra; see also Iversen v. Commissioner, T.C. Memo. 2012-19; Barniskis v. Commissioner, T.C. Memo. 1999-258; Goshorn v. Commissioner, T.C. Memo. 1993-578.

[31]In the stipulation of facts, the parties agreed that if the Court found the airplane activity passive, certain income and expenses related to the airplane would be moved from Mr. Williams' Schedule C for WPP to his Schedule E. At trial, respondent moved to amend the pleadings to include other items respondent

(continued...)

**[*26]** <u>Section 6662(a) Accuracy-Related Penalty</u>

Respondent determined an accuracy-related penalty under section 6662(a) for 2007. Section 6662(a) imposes a 20% accuracy-related penalty on "any portion of an underpayment of tax required to be shown on a return" if the underpayment is due to, among other reasons, negligence, disregard of rules or regulations, or any substantial understatement of income tax. Respondent bears the burden of production as to the penalty.[32] The penalty will not apply to any portion of the underpayment for which a taxpayer establishes that he or she had reasonable cause and acted in good faith.[33]

As defined in the Code, "'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."[34] Negligence

---

[31](...continued) believed should be moved to the Schedule E, essentially seeking to vitiate the stipulation. Rule 91(e) states that the Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so when justice so requires. Justice does not require that we relieve respondent of his stipulation here.

[32]<u>See</u> sec. 7491(c).

[33]Sec. 6664(c)(1).

[34]Sec. 6662(c).

**[\*27]** has been further defined as a "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'"[35] Additionally, a taxpayer is negligent if he fails to maintain sufficient records to substantiate the items in question.[36]

An understatement of income tax is "substantial" if the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.[37] The understatement involved in this case exceeds 10% of the tax required to be shown on the return, which is greater than $5,000. Consequently, respondent satisfied his burden of production.

The penalty will not apply to any portion of an underpayment for which a taxpayer establishes that he or she had reasonable cause and acted in good faith.[38] The Court must consider all facts and circumstances in determining whether the

---

[35]Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g in part, remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299).

[36]See Higbee v. Commissioner, 116 T.C. 438, 449 (2001); sec. 1.6662-3(b)(1), Income Tax Regs.

[37]Sec. 6662(d)(1)(A).

[38]Sec. 6664(c)(1).

[*28] taxpayer acted with reasonable cause and in good faith.[39]  In order to establish good-faith reliance on an adviser, the taxpayer must prove that (i) he gave the return preparer complete and accurate information, (ii) an incorrect return was the preparer's fault, and (iii) he believed in good faith that he was relying on a competent return preparer's advice as to the tax treatment.[40]  Although the Williamses had a return preparer prepare their 2007 return, Mr. Williams did not allege he relied on the return preparer; rather, he made an unsupported statement that he did his own research to determine the proper characterization of the airplane and its expenses.  Mr. Williams stated that he did extensive research "mastering the deductibility" of the airplane activity, and yet he provided none of his research to show what he read or what he relied upon.  Mr. Williams is an attorney, and his research should have at the very least revealed that he needed to keep records of the time he was spending on the airplane activity.  Indeed, he was aware early on that he needed to meet either a 500-hour or a 100-hour test because he included provisions in his aircraft marketing agreements referencing the hour

---

[39]Sec. 1.6664-4(b)(1), Income Tax Regs.

[40]Estate of Goldman v. Commissioner, 112 T.C. 317, 324 (1999) (citing Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987)), aff'd without published opinion sub nom. Schutter v. Commissioner, 242 F.3d 390 (10th Cir. 2000).

[*29] requirements. However, he made no attempt to keep contemporaneous records showing what amount of time he spent on the airplane, nor did he provide any appointment books, calendars, or narrative summaries corroborating such time. Accordingly, the Williamses are liable for the section 6662(a) accuracy-related penalty for 2007.

Conclusion

Mr. Williams did not materially participate in the airplane activity; therefore the Williamses may not deduct losses for that activity in excess of the income from that activity for 2007. Further, the Williamses are liable for the accuracy-related penalty under section 6662(a).

To reflect the foregoing,

Decision will be entered

under Rule 155.