T.C. Memo. 2018-40

UNITED STATES TAX COURT

CHARLES BRUMBAUGH AND C.E. HOLIFIELD, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9161-14.                    Filed April 3, 2018.

Ronald A. Hughes, Michael R. Morris, and Mayer Nazarian, for petitioners.

Kris H. An and Jordan S. Musen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  With respect to petitioners' Federal income tax for 2007 the Internal Revenue Service (IRS or respondent) determined a deficiency of $152,602 and an accuracy-related penalty of $30,520.  The deficiency stems from the disallowance of a $348,347 flow-through loss deduction that petitioners claimed on their Schedule E, Supplemental Income and Loss, and of a $163,915

**[*2]** mortgage interest expense deduction that they claimed on their Schedule C, Profit or Loss From Business.

In a previous opinion filed April 6, 2015, we held that we lack jurisdiction in this proceeding to review the disallowance of the claimed interest expense deduction, a TEFRA partnership-level item. See Brumbaugh v. Commissioner, T.C. Memo. 2015-65. Before trial the parties stipulated that petitioner C.E. Holifield is entitled to relief under section 6015(c)[1] from joint and several liability for 2007 and that she is not entitled to any refund for that year. The issues left for decision are: (1) whether petitioners' claimed flow-through loss deduction is subject to the passive activity loss restrictions of section 469 and (2) whether petitioner husband is liable for an accuracy-related penalty. We resolve both issues in respondent's favor.

## FINDINGS OF FACT

The parties filed a stipulation of facts with accompanying exhibits and a stipulation of settled issues, both of which are incorporated by this reference. At the time they filed their petition, petitioners were married and lived in California. They have since divorced.

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[*3]** Charles Brumbaugh (petitioner) is a real estate developer who began his career as an urban planner. In 1995, after obtaining a law degree, he entered the real estate development business. Through numerous closely held entities, he specialized in the development of affordable housing projects. Until 2005 he conducted these activities mainly in the greater Los Angeles area.

In early 2005 petitioner purchased, through one of his affiliates, a large property in Oakley, California. This property is northeast of Oakland on the way to Sacramento. Petitioner entered into a partnership with the Corporation for Better Housing (CBH), a section 501(c)(3) organization, to develop the Oakley property into a multi-unit housing project with units for families and senior citizens. Petitioner had previously partnered with CBH to develop other properties.

One of the entities petitioner used to purchase and develop real estate was BLH Construction, Inc. (BLH), a C corporation. During 2007 the stock of BLH was owned as follows: 60% by petitioner, 30% by Benjamin Lingo, and 10% by Brian Holland. Petitioner's primary responsibilities at BLH involved general business logistics, while Mr. Lingo and Mr. Holland focused on project financing and construction, respectively. In 2007 petitioner devoted substantially more than 500 hours to BLH's activities.

**[*4]**    Headquartered in Bakersfield, California, BLH does construction work for properties developed by petitioner's other real estate entities.  Most of its projects involved affordable housing units.  Petitioner used BLH to perform construction activity on the Oakley property and other properties in northern California.

Before 2006 petitioner, Mr. Lingo, and Mr. Holland typically traveled to Oakley by taking a commercial flight to Oakland airport and then driving about 52 miles to the project site.  To reduce travel time, BLH began chartering aircraft to fly into smaller airports closer to Oakley and other sites in northern California. Sometime in 2006 petitioner discussed with Mr. Lingo the possibility that BLH might itself purchase an aircraft to transport BLH employees to these project sites. Mr. Lingo demurred to this suggestion because he did not wish BLH to incur the financial obligations of owning an aircraft.

Petitioner accordingly decided to purchase an aircraft himself.  In February 2006 he formed N444SS, LLC (N444SS), a California entity that has been treated at all times as a partnership for Federal income tax purposes.  Petitioner owned a 51% membership interest in N444SS, and Ms. Holifield owned a 49% member-ship interest.  Sometime in mid-2006 N444SS purchased a Beechcraft Premier I jet aircraft (Premier jet).

[*5]   On August 29, 2006, N444SS entered into a management agreement with KMR Aviation, Inc. (KMR).  Operating out of Ontario Airport near Los Angeles, KMR provides aircraft management and chartering services.  The contract stipulated that KMR was to be responsible for all managerial duties related to the Premier jet and gave KMR the exclusive right to charter the aircraft for commercial flights by third parties whenever petitioner was not using it.  KMR's responsibilities included:  (1) registering the aircraft; (2) performing any work necessary to retain FAA certification; (3) providing and paying flight crews; (4) performing all necessary aircraft maintenance; and (5) creating flight logs for all flights.  The agreement required N444SS to reimburse KMR for all expenses attributable to the aircraft.

KMR set rates for chartering the Premier jet to third-party clients and was responsible for billing and collecting fees from clients.  It then credited N444SS' account for payments it received (less service charges).  KMR chartered the Premier jet on a first-come, first-served basis; N444SS had no priority over other KMR customers for scheduling its use.  If petitioner needed an aircraft when his Premier jet was chartered to another party, he had access to any other aircraft that KMR managed.  If he chartered another KMR-managed aircraft, he received an "owner's discount" in the form of a lower hourly rate.

[*6]    During 2007 KMR chartered the Premier jet to third-party customers on 66 occasions.  BLH used the aircraft only once during that year.  On that occasion, BLH paid KMR the applicable charter fee, and KMR credited N444SS' account with that fee (less service charges).  On four other occasions, when KMR had chartered the Premier jet to third parties, BLH chartered another KMR-managed aircraft.  Mr. Holland and Mr. Lingo accompanied petitioner on some of these flights, but they also traveled to Northern California via commercial flights to Oakland airport.

In June 2007 the Premier jet manifested a problem with peeling paint that grounded the aircraft.  For this and other reasons petitioner decided to buy a more expensive jet.  On July 31, 2007, through a complex like-kind exchange, N444SS acquired a Gulfstream G-IV jet aircraft (Gulfstream jet).  N444SS then entered into a management agreement with a different aircraft chartering company, Worldwide Jet Management Corp. (Worldwide).  Worldwide thereby assumed for the Gulfstream jet management responsibilities similar to those which KMR had assumed for the Premier jet.  The FAA did not issue an airworthiness certificate for the Gulfstream jet until February 2008, and there is no evidence that petitioner or any other BLH employee used the Gulfstream jet for business purposes during 2007.

**[*7]** Petitioner prepared and timely filed for N444SS a Form 1065, U.S. Return of Partnership Income, for 2007. On that return N444SS reported an ordinary loss of $683,034 from its aircraft chartering activities. Petitioners filed Form 1040, U.S. Individual Income Tax Return, for 2007, on which they claimed petitioner's 51% share of the flow-through loss, or $348,347, as a nonpassive loss deduction on Schedule E.

The IRS selected petitioners' 2007 return for examination and recharacterized this loss as a passive loss, determining that petitioner had not materially participated in N444SS' activities. The IRS also determined an accuracy-related penalty under section 6662(a). It subsequently issued petitioners a timely notice of deficiency setting forth these adjustments, and they timely petitioned this Court for redetermination.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace; the taxpayer bears the burden of proving entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a),

**[*8]** Income Tax Regs. In certain circumstances the burden of proof on factual issues may shift to respondent. See sec. 7491(a). Petitioners have not provided "credible evidence" on the relevant factual issues, and they have not maintained all records required by the Code. See id. paras. (1), (2)(B). The burden of proof thus remains on them.

I.      Deductibility of Flow-through Loss

Individual taxpayers may generally deduct, under sections 162 and 212 respectively, ordinary and necessary expenses paid or incurred in carrying on a trade or business or for the production of income. But the Code disallows any current deduction for a "passive activity" loss. Sec. 469(a)(1), (b). Congress designed section 469 to prevent taxpayers from reducing nonpassive income by losses attributable to passive activities. See Hillman v. Commissioner, 118 T.C. 323, 329 (2002). A "passive activity loss" is the amount (if any) by which the aggregate losses from the taxpayer's passive activities exceed the aggregate income from passive activities. Sec. 469(d)(1).

Passive losses cannot be used to offset income from nonpassive activities, such as wage income. See Krukowski v. Commissioner, 279 F.3d 547, 549 (7th Cir. 2002), aff'g 114 T.C. 366 (2000). A disallowed passive activity loss is not lost; rather, it is deferred or suspended and remains available as a deduction

[*9] against future passive income. Sec. 469(b). A passive activity is an activity involving the conduct of a trade or business in which the taxpayer does not "materially participate." Sec. 469(c). Participation in an activity is "material" if it is regular, continuous, and substantial. Sec. 469(h). Regulations under section 469 provide various tests to determine whether the taxpayer materially participated in an activity.[2]

A.    Grouping

The focus of the parties' disagreement is whether petitioner "materially participated" in the aircraft chartering activity in which N444SS engaged. Petitioner's threshold contention is that N444SS' activity should be grouped with BLH's real estate activity for purposes of testing whether he "materially participated."

Section 469 does not define "activity." See Schwalbach v. Commissioner, 111 T.C. 215, 223 (1998). However, the Secretary has promulgated a regulation that allows certain activities to be grouped together and treated as a single activity

---

[2]The parties have debated whether N444SS' aircraft chartering activity should be considered a "rental activity." See sec. 469(c)(2) (providing generally that "the term 'passive activity' includes any rental activity" regardless of whether the taxpayer materially participates); sec. 1.469-4(d)(1), Income Tax Regs. (limiting the circumstances under which a "rental activity" may be grouped with a "trade or business activity"). Because we conclude for other reasons that petitioner's flow-through loss from N444SS was a passive loss, we need not decide this question. For purposes of our analysis we will assume arguendo that the aircraft chartering activity was a "trade or business activity."

**[*10]** for purposes of the "material participation" test. <u>See</u> sec. 1.469-4(c), Income Tax Regs. This regulation provides that one or more business activities "may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469." <u>Ibid.</u>

Whether activities constitute an "appropriate economic unit" involves a "facts and circumstances" test. <u>See</u> sec. 1.469-4(c)(2), Income Tax Regs. The following factors "are given the greatest weight" in making this determination: (1) similarities and differences between the two businesses; (2) the extent of common control; (3) the extent of common ownership; (4) geographic location of the business activities; and (5) interdependencies between or among the activities. <u>Ibid.</u> "Interdependencies" exist (for example) where the two businesses have substantial transactions between them, sell products or services that are normally provided together, have the same customers, have the same employees, or have a single set of books and accounting records. <u>Ibid.</u>

We find that none of these factors favors grouping the activities of N444SS with those of BLH. First, in functional terms, the two businesses have no similarities whatever. BLH is engaged in real estate construction. N444SS' sole activity during 2007 was to charter aircraft through KMR, and virtually all of the charters (66 out of 67) were made to third parties unrelated to BLH.

**[*11]** We confronted a similar situation in Williams v. Commissioner, T.C. Memo. 2014-158, 108 T.C.M. (CCH) 128. The taxpayer there, an employee of his father's telephone sales training business, chartered airplanes to travel to customers' locations instead of taking commercial flights to avoid "the notorious pat downs and searches * * * and lost baggage with the airlines." Id. at 129. After acquiring the business (a sole proprietorship) from his father, the taxpayer caused it to purchase an airplane and enter into agreements with flight schools to generate revenue when he was not using the plane. Ibid.

The flight schools rented out the aircraft for flight lessons and remitted a portion of the proceeds to the taxpayer. Id. at 130. The flight schools performed all maintenance on the aircraft, collected rental fees, marketed the aircraft, and scheduled trainings. Ibid. The taxpayer had no priority to use the aircraft, so that he had to rent other planes when the flight schools were using his. Id. at 130. We held that the taxpayer could not group the telephone sales training activity with the airplane activity for purposes of determining his "material participation" in the latter. Id. at 131. We based this holding chiefly on the lack of similarities between the two businesses and the absence of interdependence between them. Id. at 132.

As in Williams, there is no functional similarity here between the business of chartering airplanes and the business of developing real estate. N444SS entered

[*12] into a management agreement with KMR to generate revenue from third-party charters so as to reduce petitioner's net cost of owning the aircraft. The aircraft was not integrated into BLH's business in any way. Indeed, BLH's employees during 2007 flew on the Premier jet only once, and the Gulfstream jet was not available for their use at all. The first factor thus weighs heavily against grouping.

The second and third factors--the extent of common ownership and control--are neutral. Petitioner held controlling interests in BLH (60%) and N444SS (51%). But the ownership interests were quite different: Ms. Holifield held the other 49% of N444SS, whereas Messrs. Lingo and Holland held the other 40% of BLH. And it is significant that Mr. Lingo, who held 30% of BLH, made clear that he wanted nothing to do with owning an aircraft.

The fourth factor, which focuses on "geographic location," weighs against petitioner. The nerve center of N444SS' operations was at Ontario Airport, where KMR was headquartered. All chartering, maintenance, and day-to-day management activities with respect to the Premier jet occurred there. By contrast, BHL had its main office in Bakersfield and jobsites throughout California.

The fifth factor, which considers "interdependencies" between the two businesses, weighs heavily against petitioner. The business activities of BLH and

[*13] N444SS were completely distinct. They did not serve the same customers; they did not share any employees; they used separate books and records to track each entity's financial results; there were no meaningful transactions between them; and they did not offer "products or services that are normally provided together." Sec. 1.469-4(c)(2), Income Tax Regs. (final sentence). There was no integration or synergy of any sort between the two businesses.

Petitioner asserts that he purchased the Premier jet to reduce the amount of time BLH employees spent traveling to Northern California jobsites. But BLH chartered the Premier jet only once during 2007 whereas KMR chartered the aircraft 66 times to unrelated parties. This disparity by itself shows the lack of integration between the aircraft chartering business and the real estate business.

Petitioner notes that BLH chartered KMR-managed jets on four occasions when the Premier jet was chartered to other KMR clients. But we fail to see how this helps petitioner's case. The ease with which BLH could charter other aircraft at Ontario Airport underscores the absence of synergy between N444SS' business and its own. Assuming arguendo that BLH needed chartered aircraft to run its business efficiently--a dubious proposition, given that its employees could (and

[*14] often did) fly commercially to Northern California through Oakland--BLH was perfectly capable of satisfying that need without assistance from N444SS.[3]

In sum, the factors set forth in the regulations, as applied to the facts of this case, establish that BLH's real estate business and N444SS' aircraft chartering business should not "be treated as a single activity" because they do not "constitute an appropriate economic unit." Sec. 1.469-4(c)(1), Income Tax Regs. Here, as in Williams, the aircraft chartering activity was designed to generate revenue and thus reduce the taxpayer's cost of owning a private jet, not to benefit the taxpayer's principal business in any meaningful way. We accordingly conclude that N444SS' aircraft chartering activity may not be grouped with BLH's real estate activity for purposes of determining whether petitioner "materially participated" in the former.

---

[3]The KMR management agreement, which gave petitioner no priority in scheduling use of the Premier jet, underscores the lack of synergy between N444SS' business and BLH's business. Petitioner notes that, by owning a jet managed by KMR, he became entitled to an "owner's discount" when BLH chartered another KMR-managed jet. This discount took the form of a 10% to 15% reduction in the hourly rate for flight time. This discount does not give rise to a meaningful "interdependence" between BLH's real estate business and N444SS' aircraft chartering business.

**[*15]** B.     Material Participation

The regulations provide that a taxpayer will be treated as "materially participating" in an activity if he satisfies any one of seven tests.  Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).  These tests inquire (for example) whether the individual "participate[d] in the activity for more than 500 hours" during the tax year or "materially participated" in the activity during certain prior years.  Id. para. (a)(1), (5), (6).

Petitioner does not contend that he devoted more than 500 hours to N444SS during 2007.  Nor does he contend that he materially participated in N444SS in any prior year.  He contends that he satisfies only one of the seven regulatory tests for "material participation," namely, the "significant participation" test specified in paragraph (a)(4).  It provides that a taxpayer will be treated as "materially participating" in an activity if:

> The activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours * * *

An activity qualifies as a "significant participation activity" under paragraph (a)(4) if two tests are met.  First, the activity must be a "trade or business activity" in which the individual "participates * * * for more than 100 hours during such

[*16] year."  Id. para. (c)(1)(i), (2).  Second, the activity must be one in which the taxpayer would not be treated as materially participating "if material participation for such year were determined without regard to paragraph (a)(4) of this section." Id. subpara. (1)(ii).  Although this regulation is something of a word soup, its meaning and intent seem clear.  It enables a taxpayer who does not devote 500+ hours to any one activity during the year to satisfy the "material participation" test by cobbling together several smaller activities, to each of which he devotes 100+ hours during the year.  See generally Lamas v. Commissioner, T.C. Memo. 2015-59, 109 T.C.M. (CCH) 1299, 1305; Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185, 100 T.C.M. (CCH) 156, 163; Scheiner v. Commissioner, T.C. Memo. 1996-554, 72 T.C.M. (CCH) 1532, 1539.

We conclude that petitioner does not satisfy either prong of the "significant participation" test.  A taxpayer may substantiate the required hours of participation by any reasonable means, but a mere "ballpark guesstimate" will not suffice. Moss v. Commissioner, 135 T.C. 365, 369 (2010); Goshorn v. Commissioner, T.C. Memo. 1993-578, 66 T.C.M. (CCH) 1499, 1501.  In the absence of "[c]ontemporaneous daily time reports, logs, or similar documents," the extent of a taxpayer's participation may be established by "the identification of services performed over a period of time and the approximate number of hours spent performing such serv-

[*17] ices * * * based on appointment books, calendars, or narrative summaries." Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

Petitioner contends that he participated in N444SS' activities for at least 100 hours during 2007. He testified that he reviewed flight logs and charter invoices; marketed the Premier jet to potential customers; considered various maintenance issues; and contacted Raytheon, the aircraft's manufacturer, to demand compensation for the peeling paint problem. He also testified that he had researched the feasibility of a class action lawsuit against Raytheon; researched the feasibility of acquiring a new jet; and helped negotiate the acquisition of the Gulfstream jet that was placed in service the following year.

Petitioner presented no documentary evidence of any kind to substantiate these efforts or to quantify the hours they actually consumed. He supplied no contemporaneous time logs, appointment books, calendars, or narrative summaries. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. Although he testified that these tasks consumed at least 100 hours, his testimony reflects the sort of "post-event ballpark guesstimate" that we have found unpersuasive on prior occasions. See Lee v. Commissioner, T.C. Memo. 2006-193, 92 T.C.M. (CCH) 263, 265-266; Goshorn, 66 T.C.M. (CCH) at 1501. We accordingly find that petitioner

[*18] has not carried his burden of proving that he participated in N444SS "for more than 100 hours during * * * [the taxable] year." Sec. 1.469-5T(c)(2), Temporary Income Tax Regs., supra.[4]

Even if petitioner had proven that he devoted the required 100+ hours to N444SS, he does not meet the second prong of the "significant participation" test, which requires that the taxpayer devote 500+ hours in the aggregate to "significant participation activities." An activity qualifies as such only if it is an activity in which the taxpayer would not be treated as materially participating "if material participation for such year were determined without regard to paragraph (a)(4) of this section," i.e., were determined without regard to the "significant participation" test. Id. subpara. (1)(ii).

Seeking to accomplish "grouping" in a different way, petitioner urges that he satisfies the "significant participation" test by adding his N444SS-related hours

---

[4]Apart from lack of substantiation, certain tasks petitioner allegedly performed for N444SS related to management of the activity or were performed in his capacity as an investor. Under the management agreement, KMR had complete responsibility for day-to-day management of the Premier jet. Because petitioner was not directly involved in the day-to-day operations, and because KMR devoted many more hours to management than he did, hours he may have logged in connection with management or in his capacity as an investor would not count toward satisfying the material participation requirement. See Serenbetz v. Commissioner, T.C. Memo. 1996-510, 72 T.C.M. (CCH) 1264, 1266; Goshorn, 66 T.C.M. (CCH) at 1501; sec. 1.469-5T(b)(2)(ii), (f)(2)(ii), Temporary Income Tax Regs., supra.

[*19] to his BLH-related hours.  But assuming arguendo that N444SS was a "significant participation activity," BLH clearly was not.  That is because petitioner during 2007 devoted well in excess of 500 hours to BLH.  He would thus qualify as "materially participating" in BLH under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra.  Since petitioner would be treated as materially participating in BLH without regard to the "significant participation" test of paragraph (a)(4), his BLH activity is not a "significant participation" activity.  See id. para. (c)(1)(ii).

Petitioner has not identified any other activity that could possibly qualify as a "significant participation activity."  His only "significant participation activity," assuming he could substantiate the required 100+ hours, would be N444SS.  He therefore has not shown that his "aggregate participation in all significant participation activities during such year exceeds 500 hours."  See id. para. (a)(4).

In sum, petitioner has failed to meet his burden of proving that he "materially participated" in N444SS during 2007.  The IRS thus correctly recharacterized, as a passive loss under section 469, the $348,347 flow-through loss deduction that petitioners claimed on their Schedule E.

**[*20]** II.     Accuracy-Related Penalty

The Code imposes a 20% penalty upon the portion of any underpayment of tax attributable to "[n]egligence or disregard of rules or regulations" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" includes "any failure to make a reasonable attempt to comply" with the internal revenue laws. Sec. 6662(c). "Negligence" also includes any failure to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.; see Olive v. Commissioner, 139 T.C. 19, 43 (2012), aff'd, F.3d 1146 (9th Cir. 2015). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. See sec. 6662(d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of any individual for any penalty. See Higbee v. Commissioner, 116. T.C. 438, 446 (2001). Respondent has satisfied his burden of production as to negligence by showing that petitioner failed to maintain adequate books and records regarding his N444SS activities. See sec. 1.6662-3(b)(1), Income Tax Regs.

In Graev v. Commissioner, 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part Graev v. Commissioner, 147 T.C. __ (Nov. 30, 2016), we held

**[*21]** that respondent's burden of production under section 7491(c) also includes establishing compliance with section 6751(b), which requires that penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination." See Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42. The record includes a copy of a Civil Penalty Approval Form, approving imposition of an accuracy-related penalty against petitioners for 2007, which was executed by the immediate supervisor of the revenue agent who examined petitioners' 2007 return. We accordingly conclude that respondent has met his burden of production for this penalty.

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and that he acted in good faith with respect to, the underpayment. The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Ibid.

**[\*22]** Petitioner is a highly sophisticated businessman.  With respect to the claimed $348,347 flow-through loss deduction, he has failed to establish that he made a good-faith effort to determine his Federal income tax liability correctly.  He kept no contemporaneous records of his activities with respect to N444SS or the time he devoted to those activities.  His argument for grouping BLH with N444SS as a single activity was extremely weak.  Although he hired a tax return preparer, he does not assert reliance on that person as a defense to the penalty.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b)(1), (c), Income Tax Regs.

We accordingly conclude that the portion of the underpayment reflecting disallowance of the $348,347 flow-through loss deduction was attributable to negligence.[5]  Alternatively, if the Rule 155 computations show that the understatement of income tax exceeds the greater of $5,000 or 10% of the amount required to be shown on the 2007 return, we conclude that the underpayment is attributable to a substantial understatement of income tax for which reasonable cause has not been shown.

---

[5]In his post-trial briefs respondent does not contend that petitioner was negligent with respect to the disallowed $163,915 mortgage interest expense deduction, an issue over which we previously determined that we lack jurisdiction.  See Brumbaugh v. Commissioner, T.C. Memo. 2015-65.

**[\*23]**  To reflect the foregoing,

Decision will be entered under

Rule 155.